Rebecca WARNER and Pamela Ann
Laxton, Plaintiffs–Appellants,

v.

GRAND COUNTY, Ron Richmond, James
B. Nyland and Robin A. Parker,
Defendants–Appellees.

No. 94–4094.

United States Court of Appeals,
Tenth Circuit.

June 13, 1995.

Eric P. Swenson, Monticello, UT (Paul G. Amann and Michael H. Wray of Amann & Wray, L.C., Salt Lake City, UT, with him on the briefs), for plaintiffs-appellants.

Karra J. Porter (Dale J. Lambert with her on the brief) of Christensen, Jensen & Powell, P.C., Salt Lake City, UT, for defendants-appellees.

Before SEYMOUR, Chief Judge, ALDISERT * and BALDOCK, Circuit Judges.

SEYMOUR, Chief Judge.

Pamela Laxton and Rebecca Warner filed this 42 U.S.C. § 1983 suit challenging the constitutionality of strip searches. The district court granted summary judgment in favor of all defendants. Ms. Laxton and Ms. Warner appeal, and we affirm.

### I.

On January 24, 1991, Officer Ron Richmond and three other officers were instructed to locate Terry Todd for purposes of a probation check. Officer Richmond sighted Mr. Todd entering a grocery store. Mr. Todd emerged accompanied by Ms. Laxton and Ms. Warner; all three then entered Ms. Warner's car. Officer Richmond observed Ms. Laxton, Ms. Warner, and Mr. Todd light and relight what appeared to be a marijuana pipe. When Ms. Warner started the engine, the officers ordered the three occupants out of the car and told them to lean across the vehicle. Ms. Laxton placed the pipe between her body and the car as she bent over the hood, and when she straightened, the pipe fell out. An officer then pat searched Ms. Laxton. Upon request, Ms. Warner produced marijuana from her coat pocket. The officers arrested and handcuffed Ms. Laxton and Ms. Warner and then took them to the Grand County Sheriff's Office.

En route, Officer Richmond requested that female personnel be available to conduct strip searches. Robin Parker, a director of a local crisis center who assisted male officers in transporting female detainees, was present at the Grand County Sheriff's Office when Officer Richmond called for assistance. Upon Officer Richmond's request, Ms. Parker remained at the sheriff's office to assist in the strip searches.

When plaintiffs arrived, Ms. Parker and Roxie Mallen, a dispatcher, performed the strip searches in a private room with no men present. The searches did not uncover any contraband. Grand County then charged Ms. Laxton and Ms. Warner with possession of marijuana, a misdemeanor, and released them.

Ms. Laxton and Ms. Warner sued Officer Richmond, Sheriff Nyland, Ms. Parker and Grand County for damages under 42 U.S.C. § 1983, alleging that the strip searches violated their First, Fourth, Fifth, Ninth, and Fourteenth Amendment rights. In response to the defendants' motion for summary judgment, the district court granted summary judgment in favor of (1) Officer Richmond on the basis of qualified immunity; (2) Ms. Parker on the basis of common law immunity; and (3) Sheriff Nyland and Grand County because their failure to train officers in strip searches did not amount to deliberate indifference to plaintiffs' constitutional rights. Ms. Laxton and Ms. Warner appeal these three rulings. We affirm for the reasons set forth below.

### II.

### Immunity of Officer Richmond and Robin Parker

We review de novo the district court's grant of summary judgment in favor of Officer Richmond on the basis of qualified immunity and Ms. Parker on the basis of common law immunity. *See Powell v. Gallentine,* 992 F.2d 1088, 1090 (10th Cir.1993).

### A. Officer Richmond

Government officials performing discretionary functions enjoy qualified immunity from civil damage suits if their conduct did

* The Honorable Ruggero J. Aldisert, United States Court of Appeals for the Third Circuit, sitting by designation.

not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). We have held that "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as plaintiff maintains." *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992). Furthermore, the law must be clearly established at the time the alleged illegal conduct occurred. *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738. Therefore, in order for plaintiffs to prevail, the law regarding the constitutionality of the strip searches in the instant case must have been clearly established on or before January 24, 1991.

■ On that date, it was clearly established in this circuit that a brief intermingling with the general jail population does not justify a strip search absent reasonable suspicion of drugs or contraband. *Hill v. Bogans,* 735 F.2d 391, 394 (10th Cir.1984). It was also clearly established that a strip search is justified if the suspect is to be "placed in the general jail population and has been charged with a drug offense such as possession of marijuana." *Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1434 (10th Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 65, 88 L.Ed.2d 53 (1985). On one end of the spectrum, *Hill* instructs that brief intermingling with the general jail population is insufficient to support a strip search; on the other end, *Lusby* holds that a drug offense charge plus intermingling is sufficient.

The facts in the instant case present a situation somewhere in the middle of this continuum. The evidence shows that Grand County had no intention of intermingling Ms. Laxton or Ms. Warner with its jail population. In fact, on the date in question, Grand County only temporarily detained female arrestees. Given the nature of the offense for which Ms. Laxton and Ms. Warner were arrested, however, Officer Richmond had reasonable suspicion that they possessed additional drugs. We cannot find any Tenth Circuit or Supreme Court authority which determines the constitutionality of a strip search under such circumstances. Without addressing the merits of the constitutional issue, we hold that it was not clearly established on the date in question that a strip search following an arrest for possession of marijuana, a misdemeanor for which there was no risk that the suspects would be intermingled with the general jail population, was unconstitutional. Accordingly, we conclude that Officer Richmond is entitled to qualified immunity.

## B.   Robin Parker

The district court granted summary judgment in favor of Ms. Parker based on a common law rule shielding private citizens from liability for "good faith" attempts to assist law enforcement officers. The district court noted that the Supreme Court's recent decision in *Wyatt v. Cole,* 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992), did not necessarily preclude qualified immunity, but chose instead to grant summary judgment on the basis of the common law defense. Plaintiffs argue that Ms. Parker should not benefit from qualified immunity or any common law defense. We affirm, but on the basis of qualified immunity rather than the common law.

■ Only a defendant acting "under color of state law" may violate section 1983. A private individual may act "under color of state law" if exercising powers "traditionally exclusively reserved to the state." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974). Ms. Parker, a private individual, acted under color of state law in conducting a strip search for contraband at the request of Officer Richmond. As an "auxiliary" to police search procedures, Ms. Parker exercised a search power which has traditionally been reserved for the states. *See Rodriques v. Furtado,* 950 F.2d 805, 814 (1st Cir.1991) (private physician who conducted vaginal search of drug suspect pursuant to search warrant was a state actor for purposes of section 1983 claim). We therefore conclude that Ms. Parker acted under color of state law in assisting Officer Richmond with the strip searches.

Because Ms. Parker assumed the role of a state actor when conducting the searches, she may be entitled to qualified immunity. In addressing this issue, we confront the following narrow question: does a private individual who performs a unique government function at the request of a state official who enjoys qualified immunity also enjoy qualified immunity? We hold that she does.

*Rodriques,* 950 F.2d 805, is analogous to the instant case. There, Dr. Falkoff, a private doctor acting under color of state law, performed a vaginal cavity search pursuant to a search warrant. The court held that Dr. Falkoff was entitled to the qualified immunity that police would have enjoyed if they had conducted the search:

> Where a private physician agrees to assist police in search procedures which police cannot reasonably, hygienically or safely perform, the physician is entitled to no less protection than the police would be if they could reasonably perform the search.

*Id.* at 815. Ms. Parker, like Dr. Falkoff, was called upon by the state to perform an investigatory function. In *Rodriques,* Dr. Falkoff's medical training qualified him, as opposed to various state officials, to execute the search warrant and conduct the vaginal cavity search. Likewise, Ms. Parker, a female, could conduct the strip searches of two female detainees less intrusively than the male officials present at the Grand County Sheriff's Office. While the court in *Rodriques* emphasized that Dr. Falkoff acted pursuant to a facially valid search warrant, we believe there is no functional difference between a doctor executing a search warrant and Ms. Parker executing an officer's ostensibly pressing request to conduct a strip search. In both cases, the state "requested" that a private citizen serve as its agent to carry out a task it was underqualified to perform itself. We therefore adopt the reasoning of *Rodriques* and hold that Ms. Parker is entitled to qualified immunity.

Plaintiffs argue that the Supreme Court's decision in *Wyatt,* 504 U.S. 158, 112 S.Ct. 1827, precludes Ms. Parker from receiving qualified immunity. We disagree for two reasons. First, the instant case is factually distinguishable from *Wyatt.* Second, granting Ms. Parker qualified immunity is consistent with *Wyatt's* discussion of the underpinnings of qualified immunity.

The Court in *Wyatt* decided a very narrow issue: qualified immunity is not "available for private defendants faced with § 1983 liability for invoking a state replevin, garnishment or attachment statute." *Id.* at 168–69, 112 S.Ct. at 1834. When invoking one of these statutes, a private individual sets "the wheels of government in motion by instigating a legal action," *id.* at 164–65, 112 S.Ct. at 1831, for his or her private benefit. The Court thus analogized *Wyatt* to the torts of malicious prosecution or abuse of process. *Id.* In the instant case, Ms. Parker did not initiate a legal action; nor did she seek to reap any private benefit. Instead, she followed the ostensibly legitimate orders of a state official for the mere purpose of assisting the state with its investigatory powers. We hold that these factual differences remove the instant case from the ambit of *Wyatt.*

In reaching this conclusion, we follow the reasoning of the two circuits that have examined the scope of the *Wyatt* holding. In *Burrell v. Board of Trustees of Ga. Military College,* 970 F.2d 785 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1814, 123 L.Ed.2d 445 (1993), Ms. Burrell sued members of Georgia Military College's (GMC) board of trustees, alleging that defendants violated 42 U.S.C. §§ 1983 and 1985(3) by conspiring to terminate her employment in retaliation for her husband's public criticism of GMC. With respect to the section 1983 claims against private defendants, the Eleventh Circuit held: "Private defendants who allegedly conspired with public officials to deprive another of her constitutional rights ... are not entitled to qualified immunity under section 1983." *Id.* at 796. In reaching this conclusion, the Eleventh Circuit discussed the scope of *Wyatt,* differentiating two groups of pre-*Wyatt* cases. In the first group, private defendants were permitted to assert qualified immunity when fulfilling duties under a government contract or following a court order. *See Frazier v. Bailey,* 957 F.2d 920, 928 (1st Cir.1992) ("[p]rivate parties under contract to perform statutorily

mandated governmental duties are entitled to qualified immunity as functionally governmental employees."); *Rodriques,* 950 F.2d 805 (physician under court order to perform vaginal cavity search entitled to qualified immunity); and *DeVargas v. Mason & Hanger–Silas Mason Co.,* 844 F.2d 714 (10th Cir.1988) (private defendant who acted in accordance with government contract and performed a government function entitled to qualified immunity). The Eleventh Circuit contrasted this first group with a second group of cases in which private defendants who invoked state law in pursuit of private ends were denied qualified immunity. *See Felix de Santana v. Velez,* 956 F.2d 16 (1st Cir.) (private defendant who allegedly conspired with district attorney to indict a co-worker for perjury in order to gain control of private cooperative not entitled to qualified immunity), *cert. denied,* —— U.S. ——, 113 S.Ct. 59, 121 L.Ed.2d 28 (1992); *Duncan v. Peck,* 844 F.2d 1261 (6th Cir.1988) (private defendant who invokes unconstitutional state prejudgment attachment statute not entitled to qualified immunity); and *Howerton v. Gabica,* 708 F.2d 380 (9th Cir.1983) (private landlord who enlisted services of police officer to effect an allegedly unconstitutional eviction not entitled to qualified immunity). The Eleventh Circuit placed *Burrell* in the second group and concluded that *Wyatt* foreclosed qualified immunity in such cases. *Burrell,* 970 F.2d at 796. While the court questioned the post-*Wyatt* vitality of the first group of cases, it did not decide whether *Wyatt* precluded qualified immunity in these cases because *Burrell* clearly fell within the second group. *Id.* at 795.

The Seventh Circuit, relying on the *Burrell* dichotomy, decided that *Wyatt* did not disrupt the *DeVargas/Frazier/Rodriques* line of cases. *Sherman v. Four County Counseling Center,* 987 F.2d 397 (7th Cir.1993). In *Sherman,* the plaintiff sued the arresting officer and a private psychiatric center under section 1983 for constitutional violations in connection with his involuntary detention and treatment as a mentally ill and dangerous person. The Seventh Circuit reasoned that cases in which private parties act pursuant to a government contract or a court order can easily be distinguished from cases in which

"private parties invoke[ ] state law in pursuit of private ends." *Id.* at 405. The court held that *Wyatt* only barred the latter. *Id.* Because the private psychiatric facility did not voluntarily and selfishly conspire with a state official to deprive the plaintiff of constitutional rights, it could raise a qualified immunity defense. *Id.* at 405–06.

As discussed above, we view this case as analogous to *Rodriques* and therefore conclude that it falls squarely within the group of cases that remains untouched by the *Wyatt* decision.

Our holding is also consistent with the public policy underpinnings of qualified immunity. The Court in *Wyatt* noted that the extension of qualified immunity to private individuals in state replevin, garnishment, or attachment proceedings would contravene the policy rationale supporting qualified immunity. The Court stated:

> Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions. Accordingly, we have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good....

*Wyatt,* 504 U.S. at 167, 112 S.Ct. at 1833 (citations omitted). The Court reasoned that granting private parties qualified immunity when invoking these state statutes would "have no bearing on whether public officials are able to act forcefully and decisively in their jobs" and that "the public interest will not be unduly impaired" if such private individuals are denied qualified immunity. *Id.* at 168, 112 S.Ct. at 1833.

On the other hand, when private defendants fulfill a state official's request to perform a governmental function, denial of qualified immunity would undermine its underlying purpose. In *Sherman,* for example, the private psychiatric facility accepted and cared for a state mental patient on an emergency basis. The Seventh Circuit concluded that denying qualified immunity under such circumstances would discourage similarly situated institutions from lending their services.

*Sherman,* 987 F.2d at 406. The court added, "We believe the public interest in maximizing the number of facilities available for the detention and treatment of the mentally ill is best served by not exposing private facilities to liability for discretionary medical judgments made under court order." *Id.* Likewise, the First Circuit in *Rodriques* concluded that denying qualified immunity to doctors presented with a court order to conduct a body cavity search would hinder the government's ability to serve the public good.

> Extending qualified immunity to physicians under the circumstances of this case not only benefits society by effectuating acceptable means to execute body cavity searches pursuant to a warrant issued on probable cause, it also benefits the party being searched by providing a safe means of conducting the search in a medically approved manner. Under the circumstances of this case, exposing private physicians to § 1983 liability without the shield of qualified immunity ... could deter them from assisting in the execution of valid warrants. A reluctance on the part of physicians to perform body cavity searches could well signal a loss to society of a valuable crime detection procedure or result in these procedures having to be carried out by nonprofessionals, a situation which would be even more intrusive of the subject's privacy.

*Rodriques,* 950 F.2d at 815.

Ms. Parker served as Officer Richmond's agent in carrying out an investigatory function unique to the government. If Ms. Parker, or others like her, are not permitted to raise the shield of qualified immunity, they might reject requests to aid state officials in performing governmental functions. This would clearly constrain state officials' agility in performing such functions, frustrate the government's investigatory power, and thereby limit the state's ability to service the public good. We conclude that granting Ms. Parker qualified immunity is wholly consistent with *Wyatt*'s discussion of the policies embodied therein.

We have already determined that Officer Richmond is entitled qualified immunity for his role in the strip searches. It would be anomalous to deny Ms. Parker qualified immunity when Officer Richmond would have received immunity had he performed the search. We hold that a private individual who performs a government function pursuant to a state order or request is entitled to qualified immunity if a state official would have been entitled to such immunity had he performed the function himself. We believe that this holding is consistent with the Supreme Court's decision in *Wyatt* and the policy rationale that has shaped the qualified immunity defense from its inception. Consequently, Ms. Parker is entitled to qualified immunity.

### III.

#### Sheriff Nyland and Grand County

Ms. Laxton and Ms. Warner argued below that Sheriff Nyland and Grand County maintained a policy and custom of inadequately training officers in handling arrestees which caused the alleged unconstitutional conduct. The district court granted summary judgment in favor of Sheriff Nyland and Grand County, concluding that neither were deliberately indifferent to any training needs. Ms. Laxton and Ms. Warner appeal this decision. After a de novo review, we affirm.

Plaintiffs argue that Grand County and Sheriff Nyland inadequately trained officers regarding the handling of arrestees and further claim that this inadequate training resulted in the allegedly unconstitutional strip searches. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). To survive summary judgment, plaintiffs must go beyond the pleadings and "show evidence of specific facts" demonstrating that Grand County and Sheriff Nyland "exhibited deliberate indifference" toward them in failing to properly train and supervise officers such as Officer Richmond. *Medina v. City and County of Denver,* 960 F.2d 1493, 1500 (10th Cir.1992). Plaintiffs

may prove, for example, that defendants' failure to train officers in the area of strip searches reflects a deliberate or conscious choice. *City of Canton,* 489 U.S. at 389, 109 S.Ct. at 1205. Plaintiffs may also prove that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious ... that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390, 109 S.Ct. at 1205.

Ms. Laxton and Ms. Warner have not met this burden. While plaintiffs argue that Grand County and Sheriff Nyland evinced deliberate indifference to plaintiffs' right to be free from unconstitutional strip searches by failing to adequately train officers, the record suggests otherwise. Grand County had a well-established policy prohibiting warrantless strip searches of temporary detainees. On the date in question, Grand County temporarily detained all female arrestees. In fact, since 1989, Grand County has not incarcerated any female arrestees.[1] Grand County officers were aware of these policies. Therefore, Officer Richmond actually violated rather than followed Grand County policy when he ordered a strip search of Ms. Laxton and Ms. Warner, two female arrestees who faced only temporary detention. Although there is little evidence in the record that Grand County trained officers for strip searches of female detainees, we conclude that Grand County and Sheriff Nyland were not deliberately indifferent to plaintiffs' needs in failing to conduct such training. Sheriff Nyland knew of no strip searches of females during his tenure. He therefore had little reason to believe that Officer Richmond or any other officer would perform strip searches of female detainees. Several Grand County employees corroborated this testimony. It would be unreasonable to conclude that Grand County or Sheriff Nyland "consciously" or "deliberately" disregarded an "obvious" need to train officers to conduct strip searches that clearly violated a policy which had been consistently followed for several years. We therefore conclude that Grand County and Sheriff Nyland were not

deliberately indifferent to plaintiffs' rights and affirm the district court's grant of summary judgment in favor of Grand County and Sheriff Nyland.

### IV.

We are not persuaded by any of plaintiffs' other contentions. We AFFIRM the district court's grant of summary judgment in favor of Officer Richmond on the basis of qualified immunity. We AFFIRM the district court's grant of summary judgment in favor of Ms. Parker on the basis of qualified rather than common law immunity. We AFFIRM the district court's grant of summary judgment in favor of Grand County and Sheriff Nyland.

---

1. Since 1989, Grand County has transported all female arrestees requiring incarceration to the San Juan County Jail. If the arrestee is a Grand County resident and non-violent in nature, Grand County will release rather than send her to the San Juan County Jail. Aplt.App. at 99.