NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0626n.06
Filed: July 27, 2005

**No. 03-2446 / 03-2461**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

CRAIG ALLEN COOK II,

      Plaintiff-Appellee,

v.

BILL MARTIN, GENE BORGERT, JEREMY STEPHENSON, CHAD JOHNSON, DAN WALLING, JEFF JONES, ROBYN FINCH, SHIJING HU, JOHN DOE I-XX, JOHN ROE I-V,

      Defendants,

JERRY HOWELL, STEVEN R. BIGCRAFT, SAMANTHA GILBERT, and LARRY MASON,

      Defendants-Appellants.

                                    /

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE:    KEITH, CLAY, and FARRIS,[*] Circuit Judges.

**KEITH, Circuit Judge.** The Plaintiff-Appellee, Craig Allen Cook II, filed suit after he sustained severe injuries during his custody by the Michigan Department of Corrections (MDOC). The Defendants-Appellants, Captain Steven R. Bigcraft, Samantha Gilbert, R.N., Deputy Warden Jerry Howell, and Larry Mason, P.A., each appeal the decision of the district court denying their respective requests for summary judgment, all of which were based upon their assertions of qualified

---

[*] The Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

immunity. Captain Bigcraft, Nurse Gilbert, and Deputy Warden Howell all assert that the doctrine of qualified immunity shields them from Cook's claims because, they say, he has failed to allege facts demonstrating that any of them acted deliberately indifferent to his serious medical needs during his time in custody. Mason, however, is a privately employed physicians' assistant, not a governmental official, and the district court determined that his private employment status did not afford him the protections of qualified immunity. Thus, on appeal, Mason asks this court to determine whether private prison medical providers enjoy the benefits of qualified immunity. For the reasons set forth below, this court AFFIRMS the decision of the district court.

## I. FACTUAL BACKGROUND

In this cause of action, Cook complains that he suffered severe injury as a result of the acts and omissions of the various Defendants. Although he has alleged multiple state and federal violations, the present appeal concerns only one asserted federal claim, namely that, in violation 42 U.S.C. § 1983, the Defendants-Appellants acted with deliberate indifference to Cook's serious medical needs in contravention of the Eighth Amendment prohibition against cruel and unusual punishment.

On June 14, 1999, state authorities arrested Cook for violating his parole and confined him to the Manistee County Jail in the State of Michigan. During his confinement in Manistee County Jail, Cook became ill; he experienced nausea, vomiting, diarrhea, profuse sweating, tingling in his arms and legs, and an accelerated heart rate. Cook never received any medical attention in response to these symptoms despite requests from him and his mother.

Sometime during his incarceration in the county jail, corrections authorities offered Cook an opportunity to participate in the MDOC ninety-day Special Alternative Incarceration program, known colloquially as "boot camp." Cook accepted, and on July 19, 1999, approximately one month after his initial confinement, the MDOC transferred him from the Manistee County Jail to Cassidy Lake boot camp.

Prior to his transfer, Cook had received lunch in Manistee County. After arriving at Cassidy Lake, however, Cook did not receive any other food or drink for the remainder of that day. And, although the following day, Cook was permitted to eat breakfast and lunch, the only drinks he received were two eight-once cartons of milk, one with each meal. After lunch, Cook was required to participate in calisthenics and a three-mile outdoor "motivational run," a strenuous physical activity consisting of push-ups, sit-ups, other exercises, and running in cadence, military style with other inmates. The temperature was approximately ninety-five degrees. Prior to commencing this exercise regimen, and in contravention to MDOC written procedures requiring a medical history assessment and physical examination at the time of arrival, Cook had not undergone any physical or mental health screening or examination by any official at Cassidy Lake.

Despite continuing to feel somewhat ill, Cook attempted to take part in the "motivational run" without advising anyone at the boot camp that he felt too ill to participate. During the run, he became increasingly physically distressed, experiencing loss of feeling in his legs, dry mouth, difficulty breathing, blurred vision, and chest pains. He had difficulty keeping up with the other runners, felt faint, and eventually passed out prior to completing the run. Cook regained consciousness with two MDOC officers hovering over him and berating him to get up and keep

3

running if he wanted to finish boot camp. In his initial attempt to get up, Cook was unsuccessful. He testified that he wanted to get up and finish the run, but his body would not let him. The MDOC officers apparently assisted him to his feet, placed him in handcuffs, and followed him to Cassidy Lake's control center, where he was forced to stand and face a wall.

Once he arrived at the control center, Cook was confronted by four officers, including the MDOC shift supervisor, Captain Steven R. Bigcraft. As Cook stood facing the wall, the officers gathered behind and yelled at him, threatening that if he failed to complete the boot camp program he would be transferred to a traditional prison. Cook responded that he wanted to finish, but also tried to explain to the officers that he could not breathe. Cook then recalls someone directing another person to bring a camera.

After that, Cook next remembers waking up at Dwayne Waters Hospital (DWH), the MDOC prison hospital in Jackson, Michigan. Although Cook does not recall the successive intervening events with specificity, Captain Bigcraft had directed another officer to begin videotaping the incident shortly after Cook had returned to the control center because Bigcraft believed that Cook's behavior was "peculiar." Joint Appendix ("J.A.") at 114. More specifically, Bigcraft recorded in his report that Cook responded affirmatively to orders to stand and face the wall, but then he failed to comply with subsequent demands from the officers. *Id*. Bigcraft also reported that Cook acted "weak and dizzy," *id*. at 418, and that Cook followed rational responses with statements such as, "you're going to kill me," *id*.[1] Bigcraft claims that he stood close to Cook so that Cook would not

---

[1]A different officer, Corporal Jeremy Stephenson, noted in his report that Cook seemed "emotionally distraught." *Id*. at 430.

4

fall down. After ordering the videotaping, Bigcraft removed other "trainees" from the area and summoned the on-duty nurse, Samantha Gilbert, R.N., to assess Cook's health.

Inasmuch as Cook does not recall in detail what occurred after Bigcraft ordered the videotaping, he relies upon the district court's summary of its observation of the video. None of the Defendants-Appellants have challenged the district court's recitation of the events as recorded in the video. Therefore, viewing the evidence in the light most favorable to Cook, as we must do, we adopt the following observations as set forth by the district court[2] in its order denying the Defendants-Appellants' motions for summary judgment:

> The tape begins with Cook standing near a wall, with his hands cuffed behind him. In response to a directive (by someone off camera) that he face the wall, Cook proclaims that he did not do anything and runs a few feet out of a nearby open door. Cook is quickly restrained by Captian Bigcraft, Corporal Chad Johnson and Corporal Stephenson and taken forcefully to the ground. [FN7] Defendants characterize Cook's effort as an attempt to escape. Cook, however, claims to have no memory of this particular series of events and suggest[s] that he was actually disoriented and not making conscious choices.
>
> > [FN7] While Cook was on the ground and still handcuffed, one officer (Corporal Stephenson according to his report) can be seen applying pressure to Cook's wrists and repeatedly advising him not to move. In response, Cook is wiggling, yelling and proclaiming that he "quits" or "gives up." Corporal Stephenson avers in his affidavit that Cook was resisting and, at one point, grabbed his wrist.
>
> Immediately thereafter, at approximately 4:40 p.m., Cook was placed in a restraint chair designed for disruptive and/or abusive boot camp trainees. While being strapped into the chair by four officers, Cook appears to start spitting. Although Defendants contend that he was attempting to spit on staff members, the officers were standing primarily to the rear of the chair, and Cook only appears to be directing his actions forward and off to the side. It is not clear that Cook was

---

[2]For purposes of consistency in this opinion, the district court's use of "Plaintiff" has been replaced with the named party, "Cook."

attempting to, or did, spit on anyone. Nevertheless, Captain Bigcraft ordered that a hockey-style mask be placed over Cook's face to prevent further spitting. The mask covered Cook's entire face with holes for his eyes and smaller holes to allow him to breath.

Cook was then moved inside the control center, into a hallway near the open door that he exited, and the restraint chair was secured onto a stationary base. The video camera was then trained on Cook for almost three hours. Contrary to Defendants' assertions that Cook was "conversant with staff" and only appeared to be fatigued during this time, very shortly after being locked into place and for most of the time that he remained in the hallway, Cook appeared to be either asleep or unconscious. He made very few movements and did not even stir: when his pulse was repeatedly taken; when nurse Gilbert and an officer were manipulating his hands and arms; or, in response to activity going on around him.

Defendants claim they did not immediately suspect that Cook was in need of medical attention. However, one person on the tape can be heard saying that Cook was behaving strangely and it appears that at least one officer was concerned with Cook's lethargic state. For instance, very shortly after moving him into the hallway, one officer started to walk by, seemed to notice that Cook was not moving, and stood to observe him briefly. He left and returned minutes later with nurse Gilbert. They each appeared to be manipulating Cook's hands and arms. [FN8] Cook remained motionless. The officer then motioned for Gilbert to step outside, out of the view or audible range of the camera. After they returned, Ms. Gilbert made a brief inspection of the ankle restraints and she and the officer left.

> [FN8] Gilbert states that she was checking Cook's fingers for capillary refill, which indicates the presence of any restriction or damage to the blood vessels in the extremities. She found Cook's capillary refill to be normal, meaning that the restraint chair straps were not too tight.

Later in the video, an officer took Cook's pulse. The officer then left and returned with nurse Gilbert, who took Cook's pulse again. Ms. Gilbert continued to check Cook's pulse periodically.

Nurse Gilbert claims to have checked on Cook at 15-minute internals. [FN9] There is no indication that she made a record of Cook's pulse rate or other vitals. She states in her affidavit that she noted Cook's heart rate to be slightly elevated but within normal limits. She attributed the elevation to his agitation and "vigorous attempts at fighting the restraints." Ms. Gilbert does not specify, but presumably she is asserting that this was her observation each time she check Cook's heart rate.

> [FN9] Although Ms. Gilbert can be seen checking Cook's pulse five different times, Cook attaches nurse Gilbert's time card to show that she punched out at 5:46 p.m. on that date (one hour after Cook was placed in the chair) and, therefore, did not examine Cook after that time. Cook also points out that Gilbert did not check Cook's waist or shoulder restraints; remove his mask; or, attempt to assess Cook's level of consciousness. In her affidavit, Gilbert asserts that, pursuant to MDOC Policy Directive 04.05.112, only the shift commander has the authority to determine the need for restraints and whether restraints are to be removed.

After Cook had been in the chair for a while and appeared to be stirring, an officer appeared and repeatedly attempted to engage Cook in general conversation. Cook moved about in the chair but did not respond. Shortly after the officer left, Cook appeared to begin breathing very heavily for a period of time and then again became motionless for another extended period. According to Captain Bigcraft and nurse Gilbert, it was when Cook failed to respond to this questioning that they regarded Cook's behavior as suspicious. Captain Bigcraft indicates in his report that at approximately 5:30 p.m. he spoke with Deputy Warden Jerry Howell and advised him of the incident with Cook. He contacted Howell again about Cook at 6:50 p.m.

At approximately 7:10 p.m., because Captain Bigcraft observed that Cook was still unresponsive and acting disoriented, he contacted Duane Waters Hospital (DWH) and received authorization to transport Cook there for evaluation. It appears on the video that Cook awoke or came to around the same time and began screaming. An officer appeared and asked him what was the problem. Cook made an inaudible response and screamed again. At that time, Corporals Johnson and Stephenson appeared, unlocked the restraint chair from the base and moved Cook, while in the chair and with the mask still on, to a van for transport to DWH. The video cuts off with the officers securing Cook's restraint chair in the transport van. He is screaming and speaking incoherently. [FN10] The tape then cuts to Cook being removed from the van at DWH.

> [FN10] Cook can be heard to say: "You guys are going to get in trouble."; "Help."; "Call the cops."; and "They're going to kill me." He also repeatedly called for his Mother and Grandfather.

*Id.* at 530-33. Although the officers did not videotape all of the events that occurred while Cook was treated at DWH, in his appellate brief Cook again relies upon the findings of the District Court:

At DWH, without ever removing Cook from the chair, Defendant Larry Mason, a physicians' assistant (P.A.), and nurse Robyn Finch, R.N., examined Cook. [FN11]. Mason indicates that he obtained a history of Cook's behavior from the transporting officers. [FN12].  Mason further states that he observed that Cook had a wound on his forehead, which the transporting officers advised was the result of his fall while being cuffed.  He then performed a basic physical examination, cleaned and dressed Cook's forehead wound, and prescribed Narcan to counter the effects of any illicit drugs Cook may have taken. [FN13].  After a while, Mason states that he removed Cook's mask.

> [FN11] Mason and Finch assert that they did not have the authority to remove Cook's restraints.

> [FN12] Per Mason, Cook presented with three problems: 1) head injury; 2) possible drug use; and, 3) erratic behavior.

> [FN13] Mason attaches his notes.  However, they are largely illegible.

Nurse Finch states in her affidavit that she performed a medical assessment and asked Cook wether he had any specific complaints.  She indicates that he denied having any pain or other medical problems and that he was conversant with staff.  She indicates that Cook did, however, occasionally ignore staff or fail to answer questions.  When she asked him what was wrong, he replied, "I do not know what is going on in my head."  Finch reported her findings to Mason, [FN14], who in turn referred Cook to the on-duty psychologist, Shijing Hu, M.S.

> [FN14] Finch states that she referred Cook to the P.A. in charge.  It seems that Mason was the P.A. in charge that evening.

Defendant Hu performed a psychological evaluation and determined that Cook did not exhibit any signs of a mood disorder, depression or suicidal ideation. [FN15]. In her affidavit, Hu states that it was her impression that Cook was "selectively performing for some staff members while ignoring others."  She found him to be coherent and conversant, and states that he did not make any specific complaints or advise of any pain.  Hu ultimately diagnosed him as a "disciplinary issue" who did not require treatment.  Thereafter, Mason authorized Cook's release to boot camp. [FN16]  Mason, Finch and Hu each assert that Cook did not appear to be in need of additional medical attention.

> [FN 15] Cook points out that Hu evaluated Cook after he had been given Narcan.  Also, without offering any documentary or other

> evidence, Cook asserts "on information and belief" that MDOC regulations and State of Michigan licensing regulations prohibit Hu, who has a Master's degree in psychology, from seeing and assessing patients clinically.
>
> [FN16] Hu states that the P.A. in charge discharged Cook. Presumably, she is also referring to Mason.

The videotape picks up again with Cook being returned to Cassidy Lake that evening. Captain Bigcraft's report indicates that Cook was returned at approximately 10:26 p.m. Over three hours had lapsed from the time Cook was transported to DWH. Cook was removed from the van without the mask, but was still strapped into the restraint chair. Cook was taken into a room inside the facility and the restraints were undone. Cook had been restrained in the chair for over six hours and had not eaten [or drank] since lunch.

Although Cook appeared somewhat responsive and coherent, when told to stand up, he was unable to do so. Cook appeared weak and unable to control his arms or legs. When asked whether he was taken out of the chair while at DWH, Cook said, "no." The tape ends with Cook still sitting in the chair.

*Id*. at 533-35.

After he was finally removed from the restraining chair, Cook was unable to remove his clothing to use the bathroom. The officers did not assist him. Rather, they directed him to either hurry up or return to his bunk. Cook returned to bed, but later advised an officer that he had diarrhea and needed to use the restroom. Again, the officer ordered him back to bed. Cook complied, but soon defecated on himself. One of the officers then summoned other officers, all of whom ordered Cook to remove his shorts. Cook could not comply with this command, so one of the officers removed them for him. One or more of the officers then directed Cook to either go back to bed or get back in the restraining chair. Cook went to bed. He was not served dinner or any other food that evening.

9

The next morning, at approximately 6:30 a.m., Cook was found in his bunk, naked, and laying in his own feces.  Officers took Cook for a shower, and a staff nurse, Jeff James, R.N., responded.  The officers and staff nurse observed Cook struggling to bathe himself for some time before the nurse finally assisted.  Nurse James indicated that Cook appeared disoriented.  Before the district court, the Defendants asserted that this was the first time that Cook appeared visibly ill.

At approximately 8:00 a.m., Cook was escorted to DWH, and from there, he was rushed by ambulance to the emergency room of Foote Hospital, where he was found to be suffering from actue renal failure.  According to the examining physician, Cook's renal failure likely resulted from rhabdomyolysis, the disintegration of striated muscle, which was possibly related to his stay in the restraints.  Cook was also diagnosed as suffering from hepatitis, possible dehydration, and other medical conditions.  He was admitted to the Intensive Care Unit, and placed on dialysis on July 23, 1999.  Cook was released from Foote Hospital and transferred to DWH on August 18, 1999, where he was treated until September 14, 1999.  He was then transferred to Cotton Correctional Facility from which he was released on parole in April 2000.

## II.  PROCEDURAL HISTORY

Cook filed his initial complaint in the Washtenaw County Circuit Court, in which he alleged state law claims against the MDOC, MDOC Director Bill Martin, Cassidy Lake Warden Gene Borgert, Cassidy Lake Deputy Warden Jerry Howell, Captain Steven R. Bigcraft, Corporal Jeremy Stephenson, Corporal Chad Johnson, Lieutenant Dann Walling, Samantha Gilbert, R.N., Jeff James, R.N., Duane L. Waters Hospital, Robyn Finch, R.N., Shijing Hu, Larry Mason, P.A., and other unidentified officers, guards, personnel, and medical providers.

Cook later filed an amended complaint in which he charged the Defendants with violations of multiple Michigan state laws and his federal statutory and constitutional rights pursuant to 42 U.S.C. § 1983. The specific claim at issue in this appeal is Cook's charge that the Defendants violated his Eighth Amendment right against cruel and unusual punishment because they were deliberately indifferent to his serious medical needs. The Defendants removed this action to the United States District Court for the Eastern District of Michigan, Southern Division, and filed motions for summary judgment on June 11, 2002.

In an Order entered on October 10, 2003, the district court granted, in part, and denied, in part, the Defendants' motions. More specifically, the district court held that officers Stephenson, Johnson and Walling were entitled to qualified immunity, and that Cook had failed to establish a claim of deliberate indifference against Hu or James. The district court, however, determined that qualified immunity did not shield Captain Bigcraft, Nurse Gilbert, or Deputy Warden Howell from Cook's deliberate indifference claim. Finally, the district court concluded that Mason had no entitlement to qualified immunity because he was a privately employed physicians' assistant.

Captain Bigcraft, Nurse Gilbert, Deputy Warden Howell, and Mason subsequently filed this appeal.

### III. DELIBERATE INDIFFERENCE CLAIMS AGAINST
### CAPTAIN BIGCRAFT, NURSE GILBERT, AND DEPUTY WARDEN HOWELL

#### A. Standard of Review

Qualified immunity is not merely a defense to be raised in response to a plaintiff's claims. Rather, where it applies, qualified immunity shields government officials from enduring a lawsuit

11

in the first instance. Thus, when the district court rejects an official's assertion of qualified immunity, it makes a purely legal determination, which we review de novo. *See Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167, 172 (6th Cir. 2004); *Scott v. Churchill*, 377 F.3d 565, 569 (6th Cir. 2004); *Tucker v. City of Richmond, Ky.*, 388 F.3d 216, 219 (6th Cir. 2004); *Virgili v. Gilbert*, 272 F.3d 391, 392 (6th Cir. 2001).

## B. Analysis

Qualified immunity "is conceptually distinct from the merits of the plaintiff's claim." *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985). It is "an entitlement not to be forced to litigate the consequences of official conduct." *Id*. "The entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id*. at 526.

In defining this entitlement, the Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In 2001, the Court established a two-part test for determining whether qualified immunity applies. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In the initial inquiry, we must consider whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Id*. If the facts as alleged by the claimant fail to establish a constitutional violation, then immunity applies. On the other hand, if the alleged facts sufficiently

12

demonstrate a constitutional violation, we must then determine "whether the right was clearly established." *Id*.

Captain Bigcraft, Nurse Gilbert, and Deputy Warden Howell all concede that it is "clearly established" that deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's protection against cruel and unusual punishment. Further, these Defendants do not contest the district court's determination that Cook had a serious medical need. Thus, on appeal this court need only decide whether pursuant to the alleged facts these Defendants' conduct demonstrates deliberate indifference.

The Supreme Court has clearly held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotations and citation omitted). Deliberate indifference takes many forms. A plaintiff can show such indifference when prison guards intentionally deny or delay access to medical care or when prison doctors fail to respond appropriately to the prisoner's needs. *Id*. The Supreme Court discussed deliberate indifference in prison-conditions cases in *Farmer v. Brennan*, 511 U.S. 825 (1994), stating that deliberate indifference "describes a state of mind more blameworthy than negligence," *id*. at 835, but also that it constitutes "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result," *id*. Thus, the Court set forth the following subjective recklessness test for deliberate indifference:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts

13

from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id*. at 837. Finally,

[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Id*. at 842.

### 1. Captain Bigcraft

Construing the facts in the light most favorable to Cook, the district court held that Cook had established that Captain Bigcraft "recognized [Cook's] need [for medical attention], but failed to act in a timely or appropriate fashion." J.A. at 559. Captain Bigcraft contests the holding of the district court on the theory that he acted reasonably by summoning Nurse Gilbert, relying on her medical training and expertise, and having Cook transferred to the prison hospital.

Although Captain Bigcraft alleges that he took these actions "in a timely fashion," the facts alleged by Cook contradict Bigcraft's representation of timeliness. When MDOC officers first escorted Cook to Captain Bigcraft, Captain Bigcraft quickly noted that Cook's behavior was peculiar, and that Cook appeared dizzy, weak, and disoriented. In fact, during this first encounter, Captain Bigcraft so appreciated Cook's obviously unhealthy condition that he saw a need to stand behind Cook to keep Cook from falling. Captain Bigcraft further recorded in his report that in response to his commands Cook gave affirmative answers to commands, followed immediately by irrational responses. Although Captain Bigcraft summoned Nurse Gilbert on the basis of Cook's actions, he simultaneous ordered other officers to shackle Cook, to strap him into a restraining chair,

14

and to mask him. While Captain Bigcraft contends that the restraining chair and mask resulted from Cook's attempt to "escape" and his spitting at the officers, the district court, after viewing the videotape, came to a different conclusion. Upon observing the tape, the district court opined that a reasonable jury could conclude that Cook's need for serious medical treatment was obvious and that his attempt to run out of the door was related to his clearly disoriented state. Further, the district court observed from the videotape that Cook was not attempting to spit on the officers because Cook spat primarily in a forward motion, yet the officers were mainly positioned behind him.

Captain Bigcraft also acknowledges that Cook became immediately unresponsive once he was placed in the restraining chair. Despite Cook's obvious unresponsive state, Captain Bigcraft delayed for several hours before taking any steps to have Cook transported to DWH. The district court concluded that "reasonable jurors could find that Bigcraft's claim that he did not believe that [Cook] was in need of medial attention until he had been strapped in the chair for several hours is contrary to his admitted observations of [Cook]." J.A. at 561. We agree. Viewing all of the above evidence in the light most favorable to Cook, we conclude that a reasonable jury could find that Cook has demonstrated that Captain Bigcraft was deliberately indifferent to his serious medical needs and that Captain Bigcraft's responses were objectively unreasonable under these circumstances.

### 2. Nurse Gilbert

The district court also determined that Cook could establish deliberate indifference by Nurse Gilbert. On appeal, Nurse Gilbert contends that the district court erred in denying her qualified immunity because "there are no facts to support that she drew the inference that her conduct posed

15

a substantial risk of serious harm to Cook," Defs.-Appellant's Br. at 22, and she merely "exercised her professional judgment in treating Cook," *id.* at 25. In sum, Nurse Gilbert's claim is that she cannot be liable for deliberate indifference where the facts alleged prove, at most, that she acted negligently in failing to diagnose Cook's condition. Negligence, Gilbert says, is an insufficient basis upon which to ground an Eighth Amendment violation of cruel and unusual punishment.

We agree with Nurse Gilbert that Cook must show something more than mere negligence in his attempt to hold her liable in the instant case. A plaintiff may establish deliberate indifference, however, by a showing of grossly inadequate medical care. *Terrance v. Northville Regional Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002) ("'deliberate indifference may be established by a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment'"); *see also Tate v. Coffee County, Tennessee*, 48 Fed. Appx. 176, 180 (6th Cir. 2002) ("a medical professional's failure to perform any of the tests that would be routinely conducted under similar circumstances rises above the level of simple negligence and can support a finding of deliberate indifference"); *Comstock v. McCrary*, 273 F.3d 693, 711 (6th Cir. 2001) (finding that doctor's evaluation of inmate was "grossly inadequate" where doctor failed to review suicidal inmate' psychological records and failed to comply with department of corrections policies on suicide prevention). In the present case, Cook has asserted facts from which a fact finder could reasonably conclude that his urgent need for medical care was obvious, and Nurse Gilbert failed to respond in an objectively reasonable manner. Cook has pled facts from which a reasonable jury could find that Gilbert acted with deliberate indifference by providing grossly inadequate medical care.

More specifically, Cook has produced evidence demonstrating that Gilbert had a responsibility, as the on-duty nurse at the time of his arrival at boot camp, to complete a health history form on him, prepare an intake history and screening form, and take his vital signs. Gilbert concedes that she did not take these actions upon Cook's arrival at the Cassidy Lake boot camp. Had Gilbert fulfilled her duties in this regard, she likely would have discovered that Cook first became ill in the Manistee County Jail.

After Captain Bigcraft summoned Gilbert to examine Cook, she was made aware that he had been unable to complete the three-mile run. A jury could also reasonably conclude that Gilbert was aware of the high temperature outside on the day in question. (Cook has alleged that the temperature was approximately ninety-five degrees.) Gilbert observed him in the restraint chair for more than an hour. In fact, she made cursory checks on him, often at the request of other officers, during which she limited her "examinations" to taking his pulse, checking his fingers for capillary refill, and perfunctory inspections of his restraints. Gilbert also noted that Cook's heart rate was elevated, and remained elevated despite his lethargic and possibly unconscious state in the restraining chair.

Perhaps more important are the obvious actions Gilbert *failed* to take in her various "examinations" of Cook. While the officers later reported to DWH personnel that Cook received a wound on his forehead when he tried to "escape," Gilbert never examined or treated that wound. Although Cook's entire face was covered by a mask, a jury could conclude that Gilbert failed to respond reasonably because she never removed Cook's mask during all of her "examinations" of him. Despite his elevated heart rate and lethargic or unconscious state, Gilbert apparently never examined Cook's eyes. Considering all of the above facts together, we believe that a jury could

17

reasonably conclude that Nurse Gilbert was deliberately indifferent to Cook's obvious serious medical needs.

### 3. Deputy Warden Howell

The district court similarly determined that Deputy Warden Howell was not entitled to the protections of qualified immunity. Howell contends on appeal primarily that he cannot be held liable for the actions of his subordinates and that he had no personal involvement in Cook's treatment on the day in question. Although Howell correctly states that a supervisor may not be made liable for the acts of his subordinate, this circuit has held that supervisors may be liable where they "implicitly authorized, approved, encouraged, condoned or knowingly acquiesced in" the actions of their subordinates. *Taylor v. Mich. Dept. of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995).

In the present case, Cook has presented evidence that Howell had a responsibility to authorize or deny the use of the restraint chair. The evidence further demonstrates that Captain Bigcraft ordered Cook into the restraining chair without waiting for proper authorization from Howell, and that Bigcraft informed Howell of his use of the restraint chair on at least two occasions on the evening in question. Despite being advised that Bigcraft had used the restraint chair without proper authorization, there is no evidence that Howell took any steps to personally assess Bigcraft's actions or the efficacy of continuing to use the restraint chair. On this record, Cook has alleged facts and produced evidence sufficient to establish that Howell was made aware of his placement in the restraint chair, but that Howell acquiesced in Captain Bigcraft's use of the chair. Howell's failure

to properly supervise his subordinates, especially where he has a clear obligation to do so, subjects him to potential liability in the present case.

## IV. ASSERTION OF QUALIFIED IMMUNITY BY MASON,
## AN EMPLOYEE OF A PRIVATE MEDICAL PROVIDER

### A. Standard of Review

When the district court rejects an official's assertion of qualified immunity, it makes a purely legal determination, which we review de novo. *See Solomon*, 389 F.3d at 172; *Scott*, 377 F.3d at 569; *Tucker*, 388 F.3d at 219; *Virgili*, 272 F.3d at 392.

### B. Analysis

At all relevant times, Larry Mason was a physicians' assistant, privately employed by Emergency Medicine Consultants, P.C., (EMC), and assigned to work at Dwayne Waters Hospital. Mason, however, concedes that he was a private employee acting "under color of state law" and that, absent some form of immunity, he would be subject to liability pursuant to 42 U.S.C. § 1983. Although Mason sought the protections of qualified immunity, the district court held, as a matter of law, that a private practitioner in Mason's position was not entitled to qualified immunity. On appeal, Mason argues the district court erred because, he says, a proper consideration of all of the relevant factors reveals that a private practitioner in his position should benefit from qualified immunity. Therefore, in this appeal, we must determine whether a privately employed physicians' assistant, assigned to a state prison hospital, may seek the protections of qualified immunity against a prisoner alleging a constitutional violation pursuant to 42 U.S.C. § 1983.

The Supreme Court provided guidance on examining this issue in *Richardson v. McKnight*, 521 U.S. 399 (1997). In that case, the Court determined that prison guards who were employed by a private prison management firm were not entitled to qualified immunity against a prisoner charging a § 1983 violation. The Court instructed in *Richardson* that we must consider two factors in determining whether private defendants enjoy qualified immunity: (1) whether "history . . . reveal[s] a 'firmly rooted' tradition of immunity" that is applicable to the private defendants, *id.* at 404, and (2) whether the "purposes" underlying the doctrine of qualified immunity warrant immunity for the defendants at issue, *id.* at 407-08. The *Richardson* Court concluded that its "examination of history and purpose . . . reveal[ed] nothing special enough about the job or about its organizational structure that would warrant providing . . . private prison guards with a governmental immunity." *Id.* at 412.

Applying these factors in the present case, this court must first decide whether the common law reveals a history of according qualified immunity to privately employed prison medical providers. In support of his claim that private prison doctors enjoyed immunity at common law, Mason cites as his sole authority a single passage from *Richardson*, in which the Supreme Court acknowledged the following:

> Apparently the law did provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign.

*Id.* at 407. Mason's reliance on this passage is unavailing. In *Hinson v. Edmond*, 192 F.3d 1342 (11th Cir. 1999), the Eleventh Circuit addressed this specific argument. In addition to noting that the Supreme Court had mentioned a "kind of immunity" for doctors who performed services at the

20

behest of the sovereign only "in passing," *id*. at 1345, the Eleventh Circuit also determined the following:

> The sources cited by the [*Richardson*] Court suggest that, under certain circumstances, English doctors and lawyers were immune from liability *for acts amounting to negligence*. For acts amounting to recklessness or intentional wrongdoing, as are alleged here, immunity did not exist, however.

*Id*. at 1345-46. Deliberate indifference claims, of course, must be premised upon something more than mere negligence. *Johnson v. Karnes*, 398 F.3d 868, 875 (6th Cir. 2005) (noting that "a plaintiff alleging deliberate indifference must show more than negligence").[3]

In *Jensen v. Lane County*, 222 F.3d 570 (9th Cir. 2000), the Ninth Circuit held that a privately employed psychiatrist was not entitled assert qualified immunity in a suit brought by a plaintiff who had been involuntarily committed to the county psychiatric hospital. Additionally, a number of district courts have held that privately employed prison medical personnel are not entitled to assert qualified immunity. *See Bafford v. Simmons*, Nos. 99-3158-JWL, 00-3023-JWL, 2002 WL 1462072 (D. Kan. Jun. 26, 2002) (denying qualified immunity to privately employed prison doctor); *Parreant v. Schotzko*, No. 00-2014 JRT/JGL, 2001 WL 1640137 (D. Minn. Sept. 30, 2001) (same); *Wolfe v. Horn*, 130 F. Supp. 2d 648 (E.D. Pa. 2001) (same); *Nelson v. Prison Health Servs., Inc*.,

---

[3]In addition, in support of his claim against Mason, Cook relies upon *Warner v. Grand County*, 57 F.3d 962, 967 (10th Cir. 1995), in which the Tenth Circuit opined that the phrase "performed services at the behest of the sovereign" more accurately is limited to a situation where a private practitioner acts upon a specific and limited request from the state. The Tenth Circuit reasoned that under such circumstance a private practitioner who performs a governmental function pursuant to a specific request by a governmental official is entitled to qualified immunity because the state official would have benefitted from qualified immunity had he performed the function himself. *Id*. We agree.

991 F. Supp. 1452 (M.D. Fla. 1997) (denying qualified immunity to privately employed prison nurses); *McDuffe v. Hopper*, 982 F. Supp. 817 (M.D. Ala. 1997) (denying immunity to privately employed prison psychiatrists and psychologist).

We therefore conclude that there is no firmly rooted history at common law of according qualified immunity to privately employed prison medical providers. Hence, Mason has failed to satisfy the first factor in determining whether a private individual is entitled to the protections of qualified immunity.

Mason has also failed to satisfy the second factor because the purposes underlying the doctrine of qualified immunity do not warrant granting immunity for privately employed prison medical providers. In *Richardson*, the Supreme Court noted three purposes upon which it has based qualified immunity for government officials charged with liability under § 1983. Qualified immunity (1) protects the government's ability to perform its traditional functions without "unwarranted timidity," 521 U.S. at 407-08, (2) "ensures that talented candidates are not deterred by the threat of damages suits from entering public service," *id*. at 411, and (3) guards against the propensity of lawsuits to distract government employees from their duties. *id*. Nonetheless, with regard to this third purpose concerning distraction, the Court noted in *Richardson* that "the risk of distraction alone cannot be sufficient grounds for an immunity." *Id*.

As for the first two purposes cited by the Court, we can discern no sufficiently meaningful distinction between the private prison management firms at issue in *Richardson* and the private prison medical providers at issue in the case at bar. Most notably, with regard to the first purpose of protecting traditional government functions from "unwarranted timidity," which the Supreme

22

Court stated is "the most important special government immunity-producing concern," *id*. at 409, the Court held that such timidity "is less likely present, or at least is not special, when a private company subject to competitive market pressures operates a prison," *id*. The Supreme Court found that the private prison management firm's performance was "disciplined, not only by state review, but also by pressure from potentially competing firms who can try to take its place." *Id*. at 410. Moreover, the Court stated, "[M]arketplace pressures provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance." *Id*. All of these principles apply to the private medical provider firm at issue in the present case.

Mason argues that his situation is distinguishable because he was assigned to a state prison hospital and was required to abide by the same guidelines and regulations as state-employed personnel, therefore his actions were controlled by state supervision, pursuant to which he is entitled to qualified immunity. Mason's private employer, EMS, however, was subcontracted to MDOC through Correctional Medical Services (CMS), a separate private enterprise. Thus, Mason is effectively two steps removed from direct state supervision and can hardly be said to be controlled by the state. Inasmuch as Mason's employer, EMS, is accountable to another private entity, CMS, rather than to the State of Michigan, surely the marketplace pressures that attend Mason's functions carry even more weight.

We turn lastly to the second purpose for qualified immunity as set forth in *Richardson* - that it "ensures that talented candidates are not deterred by the threat of damages suits from entering

public service."  For the reasons discussed above, we conclude that this factor does not apply to Mason as he is privately employed by a company clearly subject to marketplace pressures.

Our examination of the history and purposes of qualified immunity does not reveal anything sufficiently special about the work of private prison medical providers that would warrant providing such providers with governmental immunity.  Accordingly we agree with the district court that Mason is not protected by the doctrine of qualified immunity.

## V.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.