*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0323p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DEBORAH HARRISON, Personal Representative for
the ESTATE OF CHARLES KEVIN JONES,
                            *Plaintiff-Appellee,*

        *v.*

ASH, C.O., HARRELL, C.O., FELSNER, C.O., ERIC
OKE, Officer, PETE MARTIN, DAVID ABBOTT, Sgt.,
                *Defendants-Appellants (07-2077),*

TRACEY KIRK, R.N., JULIANNE MUNRO, L.P.N.,
                *Defendants-Appellants (07-2078).*

Nos. 07-2077/2078

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-70454—Arthur J. Tarnow, District Judge.

Argued: June 3, 2008

Decided and Filed: August 28, 2008

Before: MERRITT, CLAY, and GILMAN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Kristen M. Netschke, PLUNKETT & COONEY, Bloomfield Hills, Michigan, Brian
J. Richtarcik, CHAPMAN & ASSOCIATES, P.C., Bloomfield Hills, Michigan, for Appellants.
Joseph Kelly Carley, JAQUES ADMIRALTY LAW FIRM, Detroit, Michigan, for Appellee.
**ON BRIEF:** Kristen M. Netschke, PLUNKETT & COONEY, Bloomfield Hills, Michigan, Mary
Massaron Ross, PLUNKETT & COONEY, Detroit, Michigan, Brian J. Richtarcik, Ronald W.
Chapman, CHAPMAN & ASSOCIATES, P.C., Bloomfield Hills, Michigan, for Appellants. Joseph
Kelly Carley, JAQUES ADMIRALTY LAW FIRM, Detroit, Michigan, for Appellee.

---

## OPINION

---

CLAY, Circuit Judge. Charles Kevin Jones, an inmate serving a 35-day sentence for failure
to pay child support, died after suffering a severe asthma attack at the Macomb County Jail.
Plaintiff, Deborah Harrison, personal representative of the estate of Charles Kevin Jones, brought
suit pursuant to 42 U.S.C. § 1983 against Defendant-Appellants, nurses Tracey Kirk and Julianne

1

Munro and jail officers William Ash, David Abbott, Eric Oke, Pete Martin, Harrell and Felsner.[1] Harrison alleged that Defendants were deliberately indifferent to Jones' serious medical needs in violation of the Eighth and Fourteenth Amendments. Defendants moved for summary judgment and now appeal from an order entered by the district court denying summary judgment to Defendants Kirk and Munro and denying qualified immunity to Defendants Ash, Abbott, Oke, Martin, Harrell and Felsner. For the reasons described below, we **REVERSE** the district court's denial of qualified immunity with respect to Defendant officers and **DISMISS** Defendant nurses' appeal for lack of jurisdiction.

## BACKGROUND

### A.    Factual Background

On May 10, 2004, Charles Jones ("Jones") began serving a 35-day sentence for failure to pay child support at the Macomb County Jail. During the intake process at the Jail, Jones reported that he suffered from asthma for which he was prescribed an Albuterol inhaler and Prednisone, a steroid. Jones needed to ingest in 1-2 puffs from the inhaler every 4-6 hours.

At 9:00 p.m. on June 6, 2004, Jones began complaining of tightness in his chest and shortness of breath. Jones' complaints were communicated to an officer on duty, who then escorted Jones to the Jail's medical unit for treatment. Macomb County contracted with Correctional Medical Services ("CMS") to provide medical services and personnel for the facility. Pursuant to CMS protocols, when an inmate arrives at the medical unit with symptoms of asthma, nurses were required to evaluate the severity of the asthma attack utilizing a peak flow meter and to immediately call a doctor for further instructions.

When Jones was taken to the medical unit for treatment, he was examined by Tracey Kirk, R.N., a CMS employee, who observed that his Albuterol inhaler was empty. Kirk noted that Jones was wheezing "on inspiration and expiration." (J.A. at 188) Upon further examination, Kirk measured Jones' blood pressure and his blood oxygen level via a pulse oximeter.

The pulse oximeter indicated that Jones was absorbing approximately 95% of the air in the room, which was within normal ranges. Thereafter, Kirk administered four puffs from an Albuterol inhaler to Jones. After approximately five minutes, Jones was examined again and it was noted that Jones' wheezing had subsided and his blood oxygen level increased to 98%. Jones was then returned to his cell.

At approximately 10:30 p.m., Jones was returned to the medical unit, again complaining that his chest "felt tight" and that he was experiencing difficulty breathing. Jones was examined by Julianne Munro, L.P.N. During the examination, Munro observed that Jones was wheezing when he inhaled and exhaled and that he was using "accessory muscles" to breathe. Munro also noted that Jones had a blood oxygen level of 94%. Munro administered an updraft treatment[2] of Albuterol and noted some improvement. She further advised Jones to increase his fluid intake and to make the nursing staff "aware if his condition worsens." (J.A. at 197)

At 11:00 p.m., Jones again complained of breathing difficulty. Upon return to the medical unit, Munro measured Jones' blood oxygen level and noted that it was within normal ranges at 95%.

---

[1]The record does not disclose the first names of Officers Harrell and Felsner. We therefore reference the two officers by their last names throughout the opinion.

[2] "Updraft treatment" refers to the administration of Albuterol through a mask. (J.A. at 278).

Although Munro provided no additional treatment, Jones was admitted to the medical unit for observation and placed in an infirmary cell.

At 11:50 p.m., Jones once again reported difficulty breathing. Munro noted that Jones continued to experience wheezing and that his blood oxygen level had dropped to 93%. Munro administered another Albuterol updraft treatment, which brought Jones' blood oxygen level to 99%. Approximately ten minutes later, at 12:00 a.m., Jones' blood oxygen level decreased to 95%. Jones continued to experience wheezing when inhaling and exhaling.

On June 7, 2004 at 2:30 a.m., Jones contacted Officer Eric Oke through the Jail's intercom system and complained of shortness of breath and requested to go to the hospital. Officer Oke contacted Nurse Kirk "to check on [Jones]." (J.A. at 424) After speaking with Oke, Kirk came to Jones' cell to examine him. Nurses Munro and Jeanene Goodwin were also present during the examination. Kirk noted that Jones' blood oxygen level had dropped to 60%. Jones was placed on oxygen and given another Albuterol updraft treatment. Although Jones' oxygen level increased, he continued to complain of difficulty breathing and reiterated his request to go to the hospital. The nursing staff notified Dr. Bedina, the Jail physician, of Jones' condition. Thereafter, Dr. Bedina authorized Jones to be transferred to a hospital. Munro contacted Officer Abbott, who was stationed at the Jail's booking desk, and requested that he call an ambulance to transport Jones. Officer Abbott called an ambulance at approximately 2:37 a.m.

At 2:44 a.m., the ambulance arrived and emergency medical personnel were escorted to the medical unit by Officers Harrell and Felsner. Another officer, William Ash, was also present to observe Jones being transported from the medical unit to the ambulance. Although Jones' transport to the hospital was momentarily delayed because one of the nurses told emergency personnel "that the inmate's vital signs were improving and that he may be faking," Jones was placed in a wheelchair and escorted to the ambulance. (J.A. at 412) While Jones was being transported to the booking garage where the ambulance vehicle was located, Jones suffered a grand mal seizure and went into cardiac and respiratory arrest. After unsuccessful attempts to resuscitate Jones, he was transported to Mt. Clemens General Hospital. Officer Pete Martin instructed Officer Abbott to drive the ambulance while emergency personnel continued to work on Jones en route to the hospital. Once there, Jones was pronounced dead at 4:11 a.m. An autopsy later determined that Jones died as a result of a severe asthma attack.

## B.    Procedural Background

Deborah Harrison ("Harrison"), as personal representative of Jones' estate, filed the instant suit pursuant to 42 U.S.C. § 1983 alleging that a number of individuals were deliberately indifferent to Jones' serious medical needs in violation of the Fourth, Eighth and Fourteenth Amendments. Harrison also alleged that the actions of the named defendants constituted gross negligence under the Michigan Tort Liability Act. Harrison named Nurses Kirk, Munro, and Goodwin ("Defendant nurses") as well as Officers Ash, Harrell, Felsner, Oke, Martin and Abbott ("Defendant officers") as Defendants.[3] Harrison alleged that Kirk, Munro and Goodwin were deliberately indifferent as a result of their failure to follow the nursing procedures established by CMS. Specifically, Harrison contended that Defendant nurses failed to utilize required diagnostic tools, such as a peak flow meter, and that CMS staff failed to contact a doctor when Jones presented symptoms of a severe asthma attack. With respect to the Defendant officers, Harrison contended that the officers were deliberately indifferent as a result of their failure to obtain proper medical treatment for Jones when it became clear that the nursing staff was either unable or unwilling to properly treat his asthma.

---

[3]Harrison also named Macomb County as a defendant. Macomb County moved for summary judgment, which was granted by the district court. The district court's judgment with respect to Macomb County, however, is not the subject of this appeal.

All Defendants moved for summary judgment. With respect to Defendant nurses, the district court denied the motion in part and granted the motion in part. The district court found that Nurse Goodwin was entitled to summary judgment but that there were genuine issues of material fact that precluded summary judgment with respect to nurses Munro and Kirk. The district court denied Defendant officers' motion for summary judgment in its entirety. This timely appeal followed.

## DISCUSSION

### *Standard of Review*

This Court reviews a district court's denial of summary judgment *de novo*. *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1176 (6th Cir. 1996). Summary judgment is appropriate if, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As the moving parties, Defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element on each of Harrison's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Harrison, as the non-moving party, must then present sufficient evidence from which a jury could reasonably find for her. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). This Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In making this determination, this Court must draw all reasonable inferences in favor of Harrison. *See Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997).

## I.      Denial of Qualified Immunity to Defendant Officers

### A.      Jurisdiction

While most denials of summary judgment are nonfinal orders which cannot be appealed pursuant to 28 U.S.C. § 1291, it is well established that an order denying qualified immunity is immediately appealable. In *Mitchell v. Forsyth*, 472 U.S. 511 (1985), the Supreme Court held that a denial of qualified immunity is subject to an interlocutory appeal that this Court has jurisdiction to hear pursuant to the "collateral order" doctrine under § 1291. *Id.* at 525-27. Under this doctrine, the immediate review of a qualified immunity determination is based on the fact that "the qualified immunity doctrine exists partly to protect officials from having to stand trial; a defendant wrongly forced to go to trial loses the benefit of the immunity even if he or she is exonerated after trial; therefore, the order cannot effectively be reviewed after trial and is considered final." *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002).

This Court's jurisdiction regarding orders denying qualified immunity, however, is narrow. This Court may exercise jurisdiction "only to the extent that a summary judgment order denies qualified immunity based on a pure issue of law." *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006). Indeed, "a defendant entitled to invoke a qualified immunity defense may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of material fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). Rather, "the defendant must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case." *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998); *see also Booher v. Northern Kentucky Univ. Board of Regents*, 163 F.3d 395, 396-97 (6th Cir. 1999). Thus, to the extent that the denial of qualified immunity is based on a factual dispute, such a denial falls outside of the narrow jurisdiction of this Court. *Berryman*, 150 F.3d at 563; *Gregory*, 444 F.3d at 742. In the instant case, Defendant officers have conceded the facts in the light most favorable to Harrison and raise a pure issue of law

regarding Harrison's establishment of deliberate indifference in violation of the Eighth Amendment. Thus, we have jurisdiction over Defendant officers' qualified immunity appeal.

### B.  Qualified Immunity and the Deliberate Indifference Standard

Qualified immunity or "'good faith' immunity is an affirmative defense that must be pleaded by a defendant official." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). As noted above, this defense allows a government official to invoke "an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (internal citations omitted). To determine whether qualified immunity was properly denied, this Court must examine: (1) whether, considering the evidence in the light most favorable to the party injured, a constitutional right has been violated; and (2) whether that right was clearly established. *See Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005); *Comstock v. McCrary*, 273 F.3d 693, 701 (6th Cir. 2001).

In *Farmer v. Brennan*, 511 U.S. 825, 833 (1994), the Supreme Court noted that "having stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." Thus, in *Estelle v. Gamble*, 429 U.S. 97 (1976), the Court held that the Eighth Amendment requires the government "to provide medical care for those whom it is punishing by incarceration" because the failure to do so "may actually produce physical torture or a lingering death" or "[i]n less serious cases, . . . may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* at 103 (internal citations omitted). The failure to provide such medical care may result in a violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment. *Id.*

In *Estelle*, the Supreme Court held that

> deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Id.* at 104 (internal citations omitted). The Court has noted, however, that the term deliberate indifference "describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835. Indeed, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 105.

The failure to address a serious medical need rises to the level of a constitutional violation where both objective and subjective requirements are met. *See Farmer*, 511 U.S. at 833. First, the failure to protect from risk of harm must be objectively "sufficiently serious." *Id.* To meet this requirement, Harrison must show "the existence of a 'sufficiently serious' medical need." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004). Second, to satisfy the subjective requirement, Harrison must show "a sufficiently culpable state of mind in delaying medical care." *Id.* (internal citations omitted). This subjective requirement is met where a plaintiff demonstrates that prison officials acted with "deliberate indifference" to a serious medical need. An official is deliberately indifferent where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. An Eighth Amendment claimant, however, "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842.

### C.      Analysis

Before the district court, Harrison alleged that Macomb County Jail Officers Ash, Harrell, Felsner, Oke, Martin and Abbott were deliberately indifferent to Jones' serious medical needs in violation of the Eighth Amendment.  Harrison asserted that Defendant officers were deliberately indifferent as a result of their failure to contact a doctor when it became clear that Jones' condition was not improving.  Defendant officers, however, contend that they were not deliberately indifferent to Jones' medical needs because they reasonably responded to Jones' requests for medical attention in a timely manner.  In particular, Defendant officers argue that they were entitled to rely upon the medical treatment of CMS nurses once they obtained medical care for Jones.  Therefore, Defendant officers argue, the district court erroneously denied qualified immunity.  We agree.

To establish a cognizable claim of deliberate indifference in violation of the Eighth Amendment, Harrison must first establish that Jones' medical needs were "sufficiently serious."  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Blackmore*, 390 F.3d at 897 (citing *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir.1990)).  In the instant case, the parties do not dispute the fact that asthma satisfies the "objective" requirement of Harrison's deliberate indifference claim.  Indeed, the symptoms associated with an asthma attack–wheezing, difficulty breathing, tightness in the chest–are quite obvious and recognizable even to a lay person.  *See Estate of Carter*, 408 F.3d at 311-12 (finding that the plaintiff's medical need was "sufficiently serious" because he was "exhibiting the classic signs of an impending heart attack").  The parties differ, however, with respect to Harrison's satisfaction of the "subjective" requirement of her claim.  Specifically, Defendant officers contend that although they were aware of the serious risk facing Jones as a result of his asthma attack, that they were not deliberately indifferent to his serious medical needs.

In the instant case, the evidence, even when viewed in the light most favorable to Harrison, does not establish a dispute of material fact with respect to deliberate indifference on the part of Defendant officers.  As noted above, a defendant is deliberately indifferent where it can be shown that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  However,  in cases where prison officials "actually knew of a substantial risk to inmate health or safety[, they] may be found free from liability if they reasonably respond to the risk, even if the harm ultimately was not averted."  *Id.* at 844.  Here, each of the Defendant officers, Oke, Abbott, Ash, Harrell, Felsner, and Martin, reasonably responded to the substantial risk to Jones' health and were not, therefore, deliberately indifferent to Jones' serious medical needs.

### 1.      Officer Oke

At 2:30 a.m., Jones contacted Defendant Oke via intercom from his cell in the medical unit to report that he was having difficulty breathing.  Thereafter, Defendant Oke contacted Nurse Kirk "to check on [Jones]."  After examining Jones and discovering his significant deterioration, Kirk contacted Dr. Bedina and had Nurse Munro arrange for emergency medical transport to the hospital.  Although Harrison contends that Defendant Oke was deliberately indifferent to Jones' serious medical needs as a result of Oke's failure to contact a doctor, that is precisely what occurred once Oke notified the nursing staff of Jones' complaints.  Moreover, the record reflects that Oke began monitoring the medical observation unit at 12:00 a.m. and Harrison has not alleged any facts that demonstrate that Oke ignored signs that Jones was in distress between 12:00 a.m. and 2:30 a.m., when Jones requested to go to the hospital.  Thus, Oke reasonably responded to Jones' serious medical needs by contacting the nursing staff at the jail for medical assistance.  Consequently, Oke is entitled to qualified immunity.

### 2.      Officers Abbott and Martin

Similar to Defendant Oke, Defendants Abbott and Martin's contact with Jones was limited to the period when emergency services were summoned to transport Jones to the hospital. At approximately 2:37 a.m., Abbott was contacted by Defendant Munro to request that an ambulance be called for Jones. Consistent with these instructions, Defendant Abbott contacted an ambulance. Defendant Martin, who also was present when Jones went into cardiac arrest, instructed Defendant Abbott to drive the ambulance so that emergency medical staff could treat Jones while in route to the hospital. Thus, although Defendants Abbott and Martin "actually knew of a substantial risk to inmate health or safety," they are entitled to qualified immunity because "they reasonably respond[ed] to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

### 3.      Officers Ash, Harrell and Felsner

Defendants Ash, Harrell and Felsner's contact with Jones was even more limited than that of Oke, Abbott or Martin. At approximately 2:45 a.m., Defendant Ash was assigned to the "booking station." (J.A. at 411) The only evidence on the record regarding Ash's response to Jones' asthma attack was that he left the booking station to go to the medical unit to see if he could assist the nursing staff in treating Jones. At that time, Ash "didn't know what the problem was yet, [he] just knew that there was a problem." (J.A. at 412) However, Defendants Kirk and Munro were administering oxygen to Jones when he arrived.

Within a few minutes after Defendant Ash arrived at the medical unit, Defendants Harrell and Felsner escorted two emergency medical technicians to the unit where Jones was being treated. Clearly, Defendants Ash, Harrell and Felsner had minimal contact with Jones and were tangentially involved with his transportation to the hospital once an ambulance was called. Thus, it cannot be said that Defendants acted unreasonably or that Defendants were deliberately indifferent to Jones' serious medical needs.

In sum, we find that Harrison has not sufficiently demonstrated that any of the Defendant officers were deliberately indifferent to Jones' serious medical needs.[4] Even after taking the facts in a light most favorable to Harrison, the record does not demonstrate that any of the individual Defendant officers disregarded a serious risk to Jones' health by failing to report Jones' symptoms to the medical staff at the jail. While there may be occasions where deliberate indifference could be found where prison officials fail to obtain medical assistance when the local jail staff has provided inadequate treatment, this is not such an occasion. In the instant case, each of the named Defendant officers was present at the latter stage of Jones' deterioration, when it was clear that emergency medical treatment was required and emergency medical care was already en route or on the scene. Despite Harrison's assertions, there is no evidence in the record indicating that any of the named Defendants observed Jones' deterioration, between 9:00 p.m. and 2:30 a.m., during the course of his treatment by medical staff. Thus, it cannot be said that any of the Defendant officers were deliberately indifferent to Jones' serious medical needs and they are therefore entitled to qualified immunity. *See Clark-Murphy v. Foreback*, 439 F.3d 280, 287(6th Cir. 2006) (finding that two defendant prison guards were entitled to qualified immunity because each took "reasonable steps to ensure that [the other defendants] looked out for [decedent's] care" and "had no reason to

---

[4]Harrison asserts that Defendant officers are not entitled to qualified immunity because Macomb County had an inadequate policy regarding the treatment of inmates with asthma, thus evincing deliberate indifference to Jones' serious medical needs. (Pl's Br. at 33-36) To advance this argument, Harrison relies on a number of cases including *City of Canton v. Harris*, 489 U.S. 378 (1989), and *Russo v. Cincinnati*, 953 F.2d 1036 (6th Cir. 1992). *Harris* and *Russo*, however, set forth the standard for establishing deliberate indifference on the part of municipalities rather than individual defendants. Thus, Harrison's argument is unavailing with respect to Defendant officers.

expect that [the other defendants] charged with [decedent's] care would fail to secure [the necessary] help").

## II.    Denial of Summary Judgment to Defendant Nurses

Defendant nurses also appeal the district court's denial of their motion for summary judgment. As a general rule, however, 28 U.S.C. § 1291 grants appellate courts jurisdiction to hear only "final judgments" rendered by district courts. *See* 28 U.S.C. § 1291 ("The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ."). Thus, a denial of summary judgment, which is not a final order by a district court, is not immediately appealable. *Johnson v. Jones*, 515 U.S. 304, 313 (1995) (holding the district court's disposition, finding that the summary judgment record raised genuine issues of material fact regarding the merits of plaintiff's claim, was not a "final order" within the meaning of § 1291).

As noted above with respect to Defendant officers, however, under the "collateral order" doctrine, a district court's order denying summary judgment is immediately appealable where "(1) the defendant was a public official asserting a defense of 'qualified immunity;' and (2) the issue appealed concerned, not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of 'clearly established' law." *Id.* at 311. In the instant case, the district court denied Defendant nurses' motion for summary judgment on Harrison's § 1983 claim. Thus, this Court lacks jurisdiction to consider the district court's non-final order denying summary judgment under 28 U.S.C. § 1291 unless Defendant nurses are eligible to raise a qualified immunity defense. We find, however, that as employees of a private medical provider, rather than Macomb County itself, Defendant nurses may not assert a defense of qualified immunity and thus we lack jurisdiction to hear their appeal.

As an initial matter, it is undisputed that Defendant nurses are subject to suit under § 1983 because they acted "under color of state law." "It is well settled that private parties that perform fundamentally public functions, or who jointly participate with a state to engage in concerted activity, are regarded as acting 'under the color of state law' for purposes of § 1983." *Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000). In the instant case, Defendant nurses were acting under the color of state law when the alleged constitutional violation occurred because of the contractual relationship between Macomb County and CMS. Indeed, in *West v. Atkins*, 487 U.S. 42 (1988), the Supreme Court held that a private doctor under contract to provide medical care to inmates at a state prison acted under color of state law and was therefore subject to suit under § 1983. *Id.* at 56. The Supreme Court reached this conclusion after noting that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *Id.*

Being subject to suit under § 1983, however, does not mean that a party has the right to assert qualified immunity. Although § 1983 "creates a species of tort liability that on its face admits of no immunities," *Wyatt v. Cole*, 504 U.S. 158, 163 (1992), the Supreme Court has carved out areas of immunity from suit where the "tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that 'Congress would have specifically so provided had it wished to abolish the doctrine.'" *Id.* at 164 (citations omitted). In *Richardson v. McKnight*, 521 U.S. 399 (1997), for example, the Supreme Court examined historical precedent and the policy considerations undergirding the doctrine of qualified immunity to find that qualified immunity was not available to prison guards who worked for a private, for profit corporation that was under contract with the state to manage a prison. *Accord Duncan v. Peck*, 844 F.2d 1261, 1264 (6th Cir. 1988) (finding that private parties are not eligible for immunity from suit based on common law practices and policy rationales). Thus, this Court must engage in a context specific analysis,

examining the common law tradition of immunity as well as the policy considerations supporting qualified immunity, to determine whether nurses employed by a private medical provider are eligible to assert qualified immunity in a § 1983 action. *See Richardson*, 521 U.S. at 408-09; *Wyatt*, 504 U.S. at 168-69.

In *Richardson*, the Court examined the common law prior to the enactment of § 1983 to find that there was no "firmly rooted" history of providing immunity for private parties who operated prisons or other punitive establishments. While this finding might otherwise be dispositive of our inquiry into the historical record regarding immunity, the Court also observed that "the law did provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign." *Richardson*, 521 U.S. at 407. As the Eleventh Circuit noted in *Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999), however, "[t]he sources cited by the Court suggest that, under certain circumstances, English doctors and lawyers were immune from liability for acts amounting to negligence. For acts amounting to recklessness or intentional wrongdoing, as are alleged here, immunity did not exist . . . ." Indeed, it is well settled that claims of deliberate indifference must be supported by more than mere negligence.[5] *Johnson v. Karnes*, 398 F.3d 868, 875 (6th Cir. 1995). Thus, to the extent that the deliberate indifference claim at issue turns on Harrison's establishment of recklessness, like *Richardson*, we conclude that there is no "firmly rooted" common law practice of extending immunity to private actors under the circumstances present in this case. *See Jensen v. Lane County*, 222 F.3d 570, 579 (9th Cir. 2000) (denying qualified immunity to a private psychiatrist employed by a county to evaluate patients temporarily detained at the county mental health hospital).

Nor do the policy rationales undergirding qualified immunity counsel in favor of extending immunity to Defendant nurses. As the Court noted in *Wyatt v. Cole*, the doctrine of qualified immunity "strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform traditional functions." 504 U.S. at 167. Indeed, on the one hand, § 1983 is one of the most important vehicles for the vindication of constitutional and statutory rights and to insure that persons acting under of the color of state law comply with constitutional mandates. On the other hand, the threat of such suits can also dampen the vigorous exercise of official discretion and the discharge of essential governmental functions. Thus, qualified immunity allows suits which allege the violation of a clearly established constitutional right to go forward while insulating officers against suits that are frivolous or where a reasonable officer attempting to serve the public would not have known that his conduct violated a constitutional right. "In short, the qualified immunity [doctrine] . . . acts to safeguard government, and thereby to protect the public at large, not to benefit its agents." *Id.* at 167-68.

In *Richardson*, the Court stated that the policy rationales for extending qualified immunity include "protecting the public from unwarranted timidity on the part of public officials" and "encouraging the vigorous exercise of official authority." 521 U.S. at 408. Additionally, the Court noted that qualified immunity is intended to prevent lawsuits from distracting officials from

---

[5] However, even if, as a general matter, private medical providers could raise immunity from suit in the context of negligence actions, there is no such history of immunity in the state of Michigan. *See Rambus v. Wayne County General Hospital*, 483 N.W.2d 455, 457-58 (Mich. Ct. App. 1992) (finding that private medical provider was not entitled to governmental immunity despite the fact that the provider and its employees contracted with a governmental agency to provide such medical services); *Roberts v. City of Potomac*, 440 N.W.2d 55, 57 (Mich Ct. App. 1989) (denying governmental immunity to private health provider that contracted with a county hospital after finding "no reason to extend the protection of governmental immunity to a private entity merely because it contracts with the government").

adequately carrying out their duties and "ensur[ing] that talented candidates [are] not deterred from entering public service." *Id.*[6]

   In considering the first of the policy rationales supporting qualified immunity in the context of private prisons, the Court noted that "the most important special government immunity-producing concern–unwarranted timidity–is less likely present, or at least not special, when a private company subject to competitive market pressures operates a prison." *Id.* at 409. "Competitive pressures mean not only that a firm whose guards are too aggressive will face damages that raise costs, thereby threatening its replacement, but also that a firm whose guards are too timid will face threats of replacement by other firms with records that demonstrate their ability to do both a safer and more effective job." *Id.* The Court observed that the corporation was required to buy insurance to compensate victims of civil rights torts, and that its performance was regularly reviewed by government authorities, thus creating "pressure from potentially competing firms who can try to take its place." *Id.* at 410. Thus, the Court concluded that because the private firm possessed the "freedom to respond to those market pressures through rewards and penalties that operate directly upon its employees," the private guard defendants "resemble those of other private firms and differ from government employees." *Id.*

   Additionally, the Court found that the private prison would be able to insure that talented candidates are not deterred by the threat of damages even in the absence of qualified immunity. Indeed, private firms may obtain comprehensive insurance and do not operate under "civil service law restraints" and were therefore better able to "offset increased employee liability risk with higher pay or extra benefits." *Id.* at 411. Moreover, the Court held that although the possibility of being brought into court for an alleged civil rights violation could distract the employees of the private prison, "the risk of distraction alone cannot be sufficient grounds for an immunity. Our qualified immunity cases do not contemplate the complete elimination of lawsuit-based distractions." *Id.* Thus, the Court held that the private prison was not entitled to qualified immunity. In reaching this conclusion, however, the Court limited its denial of qualified immunity to the context of "a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, [which] undertakes that task for profit and potentially in competition with other firms."[7] *Id.* at 413.

   Applying the wisdom of *Richardson* to the instant case, we find that the purposes of qualified immunity do not support the extension of the doctrine to nurses employed by a private medical

---

[6] In reaching this conclusion, the Supreme Court rejected a "functional approach" to determining whether private defendants may assert qualified immunity. *Richardson*, 521 U.S. at 408. Rather, the Court concluded that whether the private guards were performing the same work as public guards was irrelevant to the question of whether the private guard defendants could invoke qualified immunity. *Id.* (noting that the Court never "held that the mere performance of a governmental function could make the difference between unlimited § 1983 liability and qualified immunity, especially for a private person who performs a job without government supervision or direction"). Noting the logical absurdity of such an approach, the Court observed that "a purely functional approach bristles with difficulty, particularly since, in many areas, government and private industry may engage in fundamentally similar activities, ranging from electricity production, to waste disposal, to even mail delivery." *Id.* at 408-09.

[7] The Court, however, reserved the question of whether "a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision" may assert qualified immunity in a § 1983 suit. *Id.* at 413. Based on this reservation, this Court has permitted defendants acting under close official supervision to assert qualified immunity in the face of a § 1983 suit. *See Bartell,* 215 F.3d at 557. In *Bartell*, for example, we held that a non-profit firm that contracted with a state social services agency for the provision of foster care services was eligible to assert qualified immunity. We reached this conclusion because the defendant was "closely supervised" by the state and because the particular function filled by the defendant, non-profit foster care services, "require[d] the deliberate and careful exercise of official discretion in ways that few public positions can match." *Id.* at 557.

provider. With respect to unwarranted timidity, the most important rationale underlying qualified immunity, it is clear that market forces will operate to insure that CMS and its employees will effectively execute their contractual duties. Like the private prison in *Richardson*, CMS must compete with other firms to obtain contracts to provide medical services in prisons and jails. At the time of the alleged constitutional violation, CMS was under a two-year agreement with Macomb County to "provide for the delivery of reasonable and necessary medical, dental, mental health and limited psychiatric care to individuals under the custody and control of the County." (J.A. at 249) Moreover, under the terms of the agreement, CMS was required to maintain liability insurance to cover claims arising out of the performance of its contractual duties. To the extent that CMS performs its contractual duties in a manner that is overly cautious or unduly concerned with its bottom line at the expense of inmate care, its performance will be subject to review at the end of the contractual term and it will likely face "pressure from potentially competing firms who can try to take its place." *Richardson*, 521 U.S. at 410. Thus, CMS and its employees have an incentive to perform in a manner that comports with constitutional standards and with the expectations of the contracting governmental entity.

Additionally, a finding that CMS nurses are ineligible for qualified immunity will not deter talented candidates from serving in such a capacity. Even in the absence of qualified immunity, CMS may attract candidates for nursing and other positions by increasing pay, benefits packages and obtaining adequate insurance coverage. Although such measures will not entirely eliminate the distraction caused by the threat of damages from a § 1983 suit, any distraction caused by the threat of suit is certainly no greater than the threat of malpractice suits faced by other medical professionals.

In short, we find that, like *Richardson*, public policy considerations do not militate in favor of qualified immunity for Defendant nurses. Here, as in *Richardson*, there are no special concerns to distinguish CMS from other private firms and thus, there is no need to extend qualified immunity to Defendant nurses. Importantly, like the company in *Richardson*, CMS is a for-profit entity that has undertaken the major administrative task of providing health care to Macomb County inmates, operates with little supervision from Jail authorities, and is subject to the pressures of the marketplace. Under these circumstances, extending qualified immunity to Defendant nurses would do little to quell the "concern that threatened liability would, in Judge Hand's words, 'dampen the ardour of all but the most resolute, or the most irresponsible,' public officials" and thus qualified immunity must be denied in this circumstance. *Richardson*, 521 U.S. at 408 (citation omitted); *see also Cook v. Martin*, 148 F. App'x 327, 342 (6th Cir. 2005); *Manis v. Corrections Corporation of America*, 859 F. Supp. 302, 306 (M.D. Tenn. 1994).

We are not alone in reaching this conclusion. In *Cook v. Martin*, 148 F. App'x 327 (6th Cir. 2005), a panel of this Court held that a physician's assistant employed by a subcontractor of CMS was not entitled to qualified immunity. The *Cook* court found that the extension of qualified immunity was inappropriate inasmuch as an examination of "the history and purposes of qualified immunity does not reveal anything sufficiently special about the work of private prison medical providers that would warrant providing such providers with governmental immunity." *Id.* at 342. Moreover, other circuits have denied qualified immunity to private medical providers under similar circumstances. *See Jensen*, 222 F.3d at 580 (finding that the policy justifications for qualified immunity did not support the availability of the defense to private psychiatrist that contracted with a county-run hospital); *Halvorsen v. Baird*, 146 F.3d 680, 685-86 (9th Cir. 1998) (private non-profit organization that contracted with municipality to provide involuntary detoxification services could not assert qualified immunity); *Rosewood Services, Inc. v. Sunflower Diversified Services*, 413 F.3d 1163, 1169 (10th Cir. 2005) (finding that policy considerations did not justify extending qualified immunity protection to non-profit firm that was under contract with the government to provide services to developmentally disabled individuals); *Hinson v. Edmond*, 192 F.3d 1342, 1347 (11th Cir. 1999) (privately employed jail physician ineligible for qualified immunity). In sum, the history

and purpose of qualified immunity, as well as the case law interpreting the scope of the doctrine, are clear that Defendant nurses, as employees of CMS, are not eligible for qualified immunity in a § 1983 suit. *Richardson*, 521 U.S. at 413. Thus, we lack jurisdiction to hear Defendant nurses' appeal of the district court's denial of summary judgment.

## CONCLUSION

For the reasons described above, we **REVERSE** the district court's denial of qualified immunity with respect to Defendant officers and **DISMISS** Defendant nurses' appeal for lack of jurisdiction.