NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0564n.06

No. 08-4499

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 12, 2009**
LEONARD GREEN, Clerk

GEORGE HAMILTON,                                )
                                                )
    Plaintiff-Appellee,                     )
                                                )
v.                                              )   ON APPEAL FROM THE UNITED
                                                )   STATES DISTRICT COURT FOR
WILLIAM ELEBY, et al.,                          )   THE SOUTHERN DISTRICT OF
                                                )   OHIO
    Defendants-Appellants.                  )
                                                )
                                                )

Before: CLAY, COOK, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. Defendant Jack Bendolph—an Ohio Department of Rehabilitation and Correction (ODRC) official—appeals the district court's denial of qualified immunity on Plaintiff George Hamilton's civil-rights action against him. We affirm.

I.

The following facts are undisputed for the purposes of this appeal. Hamilton was an inmate at Ohio's Ross Correctional Institution (RCI) in November 2003, when he received the following letter:

> We knew you been back there for a while It's just a matter of time before we get you. You slip threw our hands before, Porky But it's a small world isn't it? You are a walking ghost, will see you soon won't be long. Stop asking Questions about us. They tell us you're a dead man walking. Your friend for life.

The letter bore two lightening bolts, emblematic of the Aryan Brotherhood prison gang. Hamilton reported the letter to RCI staff, asserting that the Aryan Brotherhood had taken out a hit on him because documents from his cell had been used to prosecute Daryl Bocook—who, along with Daryl's brother, Jesse, is a member of the Aryan Brotherhood—for the murder of Hamilton's friend, Sam Huffman. Hamilton told RCI that he first learned of the hit from his ex-girlfriend, Paula Cremeans, who is the Bocooks' sister. Hamilton expressed his belief that Daryl Bocook had publicized the hit to the entire Aryan Brotherhood, and claimed that its members had previously "broke [his] face" and repeatedly attempted to stab him at a different prison.

The RCI staff then initiated a referral for Protective Control (PC), which would separate Hamilton from the general prison population for his own safety. *See* Ohio Admin. Code § 5120-9-14. The PC screening committee (the "Committee") verified that Daryl Bocook had murdered Huffman, and that Cremeans appeared on the Bocooks' and Hamilton's approved-visitor lists, as a sister and friend (later "girlfriend"), respectively. The Committee also learned that Hamilton had been granted "institutional separation" from the Bocooks, which meant that he could not be incarcerated in the same facility as either Daryl or Jesse. Although the Committee said it believed that Hamilton had authored the letter himself, it recommended placing Hamilton in PC. RCI's warden concurred, and sent his recommendation, along with the letter and the Committee's investigation report, to ODRC's Bureau of Classification, which in turn would make the ultimate decision.

The Bureau's chief, Defendant William Eleby, did not review Hamilton's request, because he had delegated PC-placement authority to his assistant, Bendolph, and another staff member.

Bendolph questioned the risk that Hamilton faced, because Hamilton had kept Cremeans—the Bocooks' sister—on his visitor list, and because some of the RCI investigative staff thought that Hamilton had sent himself the threatening letter. Bendolph reasoned that any problems were localized to RCI, and that moving Hamilton to another prison would resolve them. Accordingly, Bendolph denied PC placement and instead approved Hamilton's transfer to the general population of a different prison, the Warren Correctional Institution (WCI).

Hamilton was transferred to WCI on December 17, 2003. There he met Sain, an inmate who turned out to be a "leprechaun," which is a member of the Aryan Brotherhood without tattoos or other identifying marks. On July 3, 2004, Hamilton accepted some "hooch"—homemade alcohol—from Sain, who then told Hamilton to go into the yard's recreation shed. Inside, members of the Aryan Brotherhood attacked and brutally assaulted Hamilton. The ambush left Hamilton with impaired senses of smell, vision, hearing, and taste, as well as mental-health problems and headaches.

Hamilton brought this 42 U.S.C. § 1983 action against Eleby and Bendolph, alleging they failed to protect him from a substantial risk of serious harm, in violation of the Eighth Amendment. Both defendants moved for summary judgment on the basis of qualified immunity. The district court granted the motion as to Eleby, but denied it as to Bendolph, holding that a genuine issue of material fact existed as to whether Bendolph's decision not to place Hamilton in PC rose to the level of a constitutional violation.

This appeal followed.

## II.

A.

We review *de novo* the district court's denial of summary judgment on qualified-immunity grounds. *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008). An interlocutory appeal from the denial of qualified immunity presents only the legal question whether "the evidence [considered] in the light most favorable to the party injured" shows a violation of a clearly established constitutional right. *Id*. at 517.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It does not apply if the official violated a constitutional right that was clearly established at the time of the violation. *Harrison*, 539 F.3d at 517. This court has also examined whether "what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (*en banc*).

The right at issue here is the Eighth Amendment's prohibition of cruel and unusual punishment, which among other things requires prison officials to "'take reasonable measures to guarantee the safety of the inmates[.]'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). Although *Farmer* clearly established that a prison official's failure to prevent harm to an inmate can implicate the Eighth Amendment, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id*. at 834. Rather, to maintain an Eighth

Amendment claim based on a failure to prevent harm, Hamilton "must show that he [was] incarcerated under conditions posing a substantial risk of serious harm" (the "objective component"), and that Bendolph acted with "deliberate indifference" to that risk (the "subjective component"). *Id*. "Deliberate indifference" is a state of mind akin to criminal recklessness: "'the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001) (quoting *Farmer*, 511 U.S. at 837).

B.

We first consider whether Hamilton was incarcerated under conditions posing a substantial risk of serious harm. After documents from his cell were used to prosecute Daryl Bocook—an Aryan Brotherhood member—for murder, Hamilton received a death threat bearing the Aryan Brotherhood's symbol. He further learned, first-hand from the Bocooks' sister, that the Aryan Brotherhood had taken out a hit on him. Hamilton also maintains that Aryan Brotherhood members had previously "broke [his] face" and attempted to stab him at a different prison. This record permits a finding that Hamilton faced a substantial risk of serious harm in RCI's general population, thereby meeting the objective component of his claim.

We turn next to the subjective component, namely, whether Bendolph was both aware of facts from which he could have inferred that Hamilton faced a substantial risk of serious harm, and actually drew that inference. *See Farmer*, 511 U.S. at 837. Bendolph was undisputedly aware of the threatening letter, the Committee's findings, and the recommendations of both the Committee and the warden that Hamilton be placed in PC. Moreover—and most importantly—Bendolph

testified he knew that the Aryan Brotherhood exists throughout the Ohio prison system, and that their "hits" could follow a prisoner from one prison to another. A jury could certainly find, therefore, that Bendolph was aware of facts from which he could have inferred that Hamilton faced a substantial risk of serious harm. And it was undisputed at oral argument in this case that the record would permit (though not compel) a jury to find that Bendolph actually did draw that inference. *See also Curry*, 249 F.3d at 506 ("a factfinder may infer actual knowledge [that the plaintiff faced a substantial risk] through circumstantial evidence, or 'may conclude a prison official knew of a substantial risk from the very fact that the risk was obvious'") (quoting *Farmer*, 511 U.S. at 842).

But even if Bendolph drew the inference that Hamilton faced a substantial risk of serious harm, however, he "may be found free from liability if [he] responded reasonably to the risk[.]" *Farmer*, 511 U.S. at 844. Bendolph argues that, for several reasons, his decision to transfer Hamilton to WCI's general population was a reasonable response to the risk that Hamilton faced. First, Bendolph says that the Committee's belief that Hamilton probably wrote the death threat himself, and the fact that Hamilton kept Cremeans on his approved-visitor list despite his avowed fear of her brothers, weighed against concluding that Hamilton faced a substantial risk of serious harm. That may well be true, but those facts do not weigh *enough* to foreclose that conclusion. Second, taking the death threat on its face, Bendolph maintains that the statement, "[w]e knew you been *back there* awhile" supports his conclusion that Hamilton's problem was localized to RCI. Appellants' Br. at 9 (emphasis in original). But "back there" could mean prison in general as much as a specific facility, and Bendolph acknowledged that the Aryan Brotherhood can convey a "hit" from one prison to another. That acknowledgment likewise undermines Bendolph's third point,

which is that his actions were reasonable because he transferred Hamilton to a facility where he "had no institutional separations from any inmate." *Id*. Fourth, Bendolph argues that WCI "housed one of the two PC units in the ODRC system, which would serve as a reminder to Hamilton that if the transfer did not solve the problem . . . he could always renew the PC request." *Id*. But that argument begs the question whether Hamilton should have even *needed* to renew the request. And finally, Bendolph argues that the reasonableness of his response is demonstrated by the fact that Hamilton was not assaulted for six months after his transfer to WCI. That too might weigh in Bendolph's favor in the jury's determination of reasonableness; but the facts of this case themselves suggest that prison hits sometimes take time to carry out. The six-month delay, therefore, is not enough to take away from the jury the question whether Bendolph's response was reasonable.

The district court's denial of qualified immunity is affirmed.