**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 14a0566n.06

**Case No. 13-2182**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 28, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MAURICE GHOLSTON, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| WAYNE COUNTY AIRPORT AUTHORITY, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | O P I N I O N |
| | | |

KEVIN BAUR; CORPORAL JOHANSEN;
CORPORAL TYLUTKI; SERGEANT
VINCENT; CORPORAL JOHNSON,

        Defendants-Appellants.

BEFORE: BOGGS, COLE, and STRANCH, Circuit Judges.

COLE, Circuit Judge. Plaintiff Maurice Gholston filed this action under 42 U.S.C. § 1983, alleging that five law enforcement officers acted with excessive force when they repeatedly tased him, forcefully pushed him to the ground, and neglected to loosen handcuffs that they applied too tightly, all while endeavoring to remove him from an airport restaurant where he worked. Because the officers dispute relevant and material facts in Gholston's account, we dismiss this appeal for lack of jurisdiction.

## I. BACKGROUND

### A. Factual Background

At the time of the events in question, Gholston was employed at a McDonald's restaurant located in the secure "sterile zone" of the Detroit Metropolitan Airport. Although Gholston began as a full-time employee, his hours had recently been cut, and managers had been asking him to leave his shifts early. Gholston was concerned that this reduction in hours would imperil his health-insurance benefits. He discussed this matter with Sharonda Dorsey, a supervisor, who he says assured him that his hours would not drop below 25 per week.

The events giving rise to this lawsuit occurred sometime later, on January 10, 2011. That day, Gholston was scheduled to work from 6:00 to 10:00 p.m. But Gholston and the on-site manager, Shantel Kennedy, disagreed about Gholston's hours. Gholston insisted that, in light of his discussion with Dorsey, he was entitled to work until 11:00 p.m. At 10:00, Kennedy repeatedly asked Gholston to leave, but Gholston refused and continued cleaning the restaurant to prepare it for closing. Kennedy then sought the help of airport security, who called the airport police.

The record provides numerous, often inconsistent accounts of the events that follow. Kevin Baur was the first officer to reach the McDonald's. Upon arriving, Baur instructed Gholston to leave the premises. Gholston did not comply but instead explained the disagreement over his hours and asked for Baur's name and badge number. According to Gholston, he agreed to leave once he had this information, but Baur refused to give it to him and would not allow him to find a pen and write it down. Gholston and Baur agree that Gholston then walked to another area in the back of the restaurant to get his coat and asked again for the officer's name and badge number. Baur informed Gholston that he was under arrest, and at this point—and perhaps

earlier, as well—Baur called for additional officers. Baur and Gholston offer differing accounts of what happened while Baur was awaiting back-up; Gholston claims that he asked Baur to explain why he was being arrested, whereas Baur claims that he verbally ordered Gholston to submit to an arrest but that Gholston refused and resisted being handcuffed. At this time, a second officer, Jeffrey Tylutki, arrived.

Gholston describes the next events as follows. He says that, after he attempted to discuss the situation with Tylutki, the officers instructed him to turn around and place his hands behind his back. He ignored this command. A third officer—Bradford Vincent—arrived, and Gholston again tried to explain to Vincent that it was not necessary to arrest him. One of the officers then took out a taser, and Gholston asked him not to use it because he has asthma. While one officer wielded the taser, another officer grabbed for Gholston's arm, but he "jerk[ed]" it away. At this point, the officer holding the taser activated it, and its prongs attached to Gholston, delivering an electric current. The officers then "grabbed" Gholston and "threw [him] to the ground," chipping his tooth in the process. Gholston testified in his deposition that, while he was on the ground, face down, he continued to feel "sharp pain and stinging" on his back, "like [he] was being electrocuted." He claims that these sensations continued after he had been handcuffed.

The officers' versions of events are, not surprisingly, different from Gholston's. The notable discrepancies include, first, how Gholston reacted to the initial use of the taser. Although Gholston claims that he felt pain associated with electrocution, his body "tighten[ed]," and he was "in shock," Baur and Tylutki say that he appeared unaffected and removed the taser wires from his clothing.

The parties also disagree as to whether Gholston was tased after being physically restrained. Gholston says he was, and the officers say he was not. According to Baur, after the

initial use of the taser, the officers continued to struggle with Gholston. He says they placed him against a wall and tased him again on his back two or three more times until they were able to "slid[e]" him to the floor. Tylutki's account is somewhat different. He also testified that he tased Gholston two or three additional times, but he could not recall whether Gholston was standing during these activations. Although Tylutki added that Gholston was "almost like laying [sic] prone" during his last use of the taser, he later acknowledged that, once on the floor, Gholston stopped resisting and Tylutki no longer needed to use the taser.

Lastly, the accounts differ as to whether Gholston attempted to use force against the officers. Baur and Vincent testified that they did not observe Gholston attempt to punch or strike an officer at any time during the encounter, whereas Tylutki claimed that Gholston "swung" at Baur after his first use of the taser.

Whatever else the parties disagree about, one thing is clear. When a taser is activated, it records data about its usage. The data from Tylutki's taser establishes that, during the events in question, it was activated at least eight times in a span of under two minutes. These activations varied in length from one second to six seconds. The record also contains photos of Gholston's back, with multiple visible marks in various areas, which Gholston testified were taser burns.

After Gholston was brought to the ground, Baur handcuffed him and the officers began to lead him out of the airport. Gholston testified that, after the handcuffs were applied, he felt pain in his wrist and noticed that one of his teeth had been cracked. Gholston states that his handcuffs were too tight and that he repeatedly complained about them, but the officers refused to loosen them. Baur and Vincent, on the other hand, agree that Gholston complained his handcuffs were too tight but claim that Baur promptly loosened them. Two additional officers, Charles Johnson

and Erik Johansen, arrived on the scene just as Gholston was being escorted from the restaurant; they agree that Gholston complained about his handcuffs and that Baur adjusted them.

Three of the officers—Johnson, Johansen, and Vincent—then escorted Gholston to a patrol car. According to Johnson and Johansen, Gholston did not mention his handcuffs again. Gholston disagrees.

Before Gholston was taken to the airport police station, an Emergency Medical Technician ("EMT") briefly examined him. The technician's report noted, among other things, "swelling/bruising in [Gholston's] left wrist." Gholston was then transported to the police station. While trying to book him, Vincent noticed that Gholston "was still . . . breathing heavy" and complaining, so Vincent had another EMT dispatched to the station. According to the EMT, Gholston appeared anxious and was hyperventilating. He also noted in a report that Gholston had a chipped front tooth and swelling in his left wrist. The EMT then transported Gholston to a hospital, although he did not believe that Gholston was suffering from a medical emergency. Baur accompanied Gholston and the EMT to the hospital, during which time Gholston remained under arrest. However, once they arrived, Baur issued Gholston a citation for disorderly conduct and resisting arrest and then released him. Gholston's hospital records indicate the presence of asthma-related symptoms and soreness, tenderness, and numbness around his left wrist.

## B. Procedural History

Gholston filed a complaint in the United States District Court for the Eastern District of Michigan against the Wayne County Airport Authority and the five officers, alleging that the officers used excessive force in arresting him and that they exhibited deliberate indifference to his serious medical need, both in violation of 42 U.S.C. § 1983. Gholston claimed that the officers violated his right to be free of excessive force in three distinct ways: first, by repeatedly

tasing him; second, by pushing him to the floor so forcefully that he chipped a tooth; and third, by handcuffing him too tightly and then neglecting to loosen the handcuffs despite his complaints. The parties then stipulated to the dismissal of the claims against Wayne County Airport Authority only.

The parties proceeded to discovery, and the officers filed individual motions for summary judgment, arguing that Gholston had failed to show a genuine dispute of material fact and that they were entitled to qualified immunity.

The district court denied the officers' motions for summary judgment on the excessive-force claim, finding that "if a jury accepts Gholston's testimony as true, the defendants are not entitled to qualified immunity." *Gholston v. Baur*, No. 12-11074, 2013 WL 3879794, at *12 (E.D. Mich. July 26, 2013). The court granted their motions on the deliberate-indifference claim, however, upon concluding that Gholston was not denied medical care. The officers then moved for reconsideration, which the district court denied. They timely appealed. Gholston does not appeal the dismissal of his deliberate-indifference claim.

## II. ANALYSIS

### A. This Court's Jurisdiction

Although district court orders denying summary judgment are generally not appealable, a federal court of appeals may review an order that denies a party qualified immunity. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2018–19 (2014). In such instances, the appellate court's jurisdiction "is limited to resolving pure questions of law." *Moldowan v. City of Warren*, 578 F.3d 351, 369 (6th Cir. 2009) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)); *see also Johnson v. Jones*, 515 U.S. 304, 313, 316–18 (1995) (holding that court of appeals lacks jurisdiction to review denial of summary judgment based only on "evidence sufficiency"). For appellate jurisdiction to

exist, the defendant-appellant must be willing to "concede an interpretation" of the relevant facts "in the light most favorable to the plaintiff's case," and must argue that, even on those facts, he or she is entitled to qualified immunity. *Harrison v. Ash*, 539 F.3d 510, 517 (6th Cir. 2008) (quoting *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998)).

Still, this court is not compelled to conclude that it lacks jurisdiction simply because the district court or the parties say so. "Regardless of the district court's reasons for denying qualified immunity, we may exercise jurisdiction over the appeal to the extent it raises questions of law." *Williams v. Mehra*, 186 F.3d 685, 689–90 (6th Cir. 1999) (en banc) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996)); *see also Behrens v. Pelletier*, 516 U.S. 299, 312–13 (1996); *Plumhoff*, 134 S. Ct. at 2018–20. Additionally, when one party's version of the events "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment," including one involving qualified immunity. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Subject to the jurisdictional limitations discussed above, this court reviews de novo a district court's denial of summary judgment on the basis of qualified immunity. *Moldowan*, 578 F.3d at 373. As with other appeals involving summary judgment, we draw all factual inferences in favor of the non-moving party. *Id.* at 374.

## B. Qualified Immunity and Excessive Force

The doctrine of qualified immunity shields government officers from civil liability for actions they take while pursuing their official duties, so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal quotation marks omitted).

This inquiry is comprised of two parts: (1) whether the defendant officer violated a constitutional or statutory right, and (2) whether that right was clearly established at the time of its alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A court may consider these two questions in either order. *Id.* at 236.

Excessive-force claims are "governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff*, 134 S. Ct. at 2020 (citing *Graham v. Connor*, 490 U.S. 386 (1989)). If the officers' actions were "objectively reasonable in light of the facts and circumstances confronting them," they have not violated the plaintiff's right to be free of excessive force. *Graham*, 490 U.S. at 397 (internal quotation marks omitted). This inquiry is highly fact-specific and requires courts to consider such factors as the severity of the plaintiff's crime, whether he posed a threat to the safety of the officers or of others, and whether he resisted arrest or attempted to flee. *Id.* at 396. Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

While the above framework governs excessive-force claims generally, this court has also developed more specific principles applying to the use of stun guns and handcuffs. When a plaintiff is tased while "actively resisting arrest by physically struggling with, threatening, or disobeying officers," courts have concluded either that the officers did not violate the plaintiff's right to be free of excessive force, or that the particular right in question was not clearly established when the incident occurred. *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012) (collecting cases); *see also Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012). In contrast, an officer does violate clearly established law if he or she "tases

a plaintiff who has done nothing to resist arrest or [who] *is already detained*." *Cockrell*, 468 F.3d at 496 (emphasis added); *Landis v. Baker*, 297 F. App'x 453, 461–62 (6th Cir. 2008).

Additionally, an officer may act with excessive force if he or she applies handcuffs too tightly or too roughly. *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009). To survive summary judgment on this particular claim, a plaintiff must show that (1) he complained about the handcuffs, (2) the officer ignored the complaints, and (3) he suffered "some physical injury" due to the handcuffs. *Id.* Swelling and numbness of the wrists are enough to meet this third requirement, as is bruising. *See id.* at 402–04; *Martin v. Heideman*, 106 F.3d 1308, 1312–13 (6th Cir. 1997).

Lastly, an officer can be liable for the use of excessive force even though he did not personally exert force against the plaintiff. If an officer (1) observed or had reason to know that excessive force was being used and (2) had the opportunity and the means to prevent it, the officer may be liable. *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013) (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

## C.  Disputed Questions of Fact

With these legal standards in mind, we turn again to the facts of this case. Here, the officers continually dispute the facts, and although making a bow occasionally to arguments notwithstanding a contrary view of the facts, do not, in our view, make a coherent legal argument that takes them out of the strictures of *Johnson v. Jones*. *See* 515 U.S. at 313, 316–18. Therefore, we lack jurisdiction to consider this appeal.

As their briefs make clear, the officers continue to dispute at least three significant facts. First, the officers argue that Gholston cannot prove that he was tased after being handcuffed or that Tylutki knew exactly when the handcuffs were applied. Second, they argue that Gholston

could not possibly have been thrown to the ground hard enough to result in a chipped tooth because the record contains no evidence of other facial injuries. Third, they claim that a jury would be compelled to conclude *either* that Gholston's handcuffs were never too tight, *or* that Baur adjusted them appropriately, because "there is no evidence in the record that the handcuffs were on too tightly at the time of the EMT examination." All of these disputed facts are relevant and material to the legal question at issue: whether the officers exerted excessive force in effecting Gholston's arrest. Moreover, many of the defendants' legal arguments rest on their particular version of the facts. As a result, we do not have jurisdiction to hear this appeal. *See Harrison*, 539 F.3d at 517; *see also Younes v. Pellerito*, 739 F.3d 885, 889 (6th Cir. 2014) (noting that this court lacks jurisdiction when the defendant officers "state that they are conceding the view of the facts most favorable to" the plaintiff but "their arguments dismiss or ignore relevant aspects" of the plaintiff's account).

The officers argue that this court still has jurisdiction under the logic of *Scott v. Harris*, in which the Supreme Court reversed a denial of qualified immunity even though the defendants agree to the plaintiff's version of the facts on appeal. *See* 550 U.S. at 380–81. But *Scott* is applicable only if there are objective facts in the record, such as a video, showing that one party's account is simply beyond belief. *Id.*; *see also Coble v. City of White House*, 634 F.3d 865, 868–69 (6th Cir. 2011) (summarizing cases). The record here provides no such thing. While it does contain medical files and other reports, none of these documents necessarily discredit Gholston's story. *See Coble*, 634 F.3d. at 869–70; *Carter v. City of Wyoming*, 294 F. App'x 990, 992–93 (6th Cir. 2008). Ultimately, the parties' accounts conflict, and the officers have not agreed to Gholston's version for the purposes of this interlocutory appeal. With key

facts in dispute, we cannot reach the legal matter of the officers' entitlement to qualified immunity.

## III. CONCLUSION

We dismiss this appeal for lack of appellate jurisdiction.