NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0058n.06

Case No. 14-3460

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 20, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CLARENCE SANFORD, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LISA STEWART, Individually; SUZANNE | ) | |
| MOORE, Individually, CHERYL | ) | |
| RICHARDS, Individually; SANDRA | ) | ON APPEAL FROM THE UNITED |
| FLOOD, Individually; ADRIENNE | ) | STATES DISTRICT COURT FOR |
| WELFLE, Individually | ) | THE NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendants-Appellants. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DENISE JAMES, Individually, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____/ | ) | |

BEFORE: MERRITT, MOORE, and DONALD, Circuit Judges.

**MERRITT, Circuit Judge.** In this § 1983, interlocutory, qualified immunity appeal raising factual issues, we conclude that we do not have appellate jurisdiction. Plaintiff Clarence Sanford, a former juvenile inmate at the Indian River Juvenile Correctional Facility ("Youth Facility") in Stark County, Ohio, commenced this action against the Defendant-Nurses alleging

collective deliberate indifference in violation of his Eighth Amendment rights. Specifically, Sanford alleged that the Nurses refused to provide timely and urgent medical attention after receiving notice of his symptoms. As a result, he became septic, was hospitalized, contracted pneumonia, and had to undergo surgery. After proceeding with discovery, the Nurses moved for summary judgment based on grounds of qualified immunity — even though the Ohio Department of Youth Services itself had concluded after investigation that the Nurses had "failed to provide adequate medical care." *See* Report of Investigation, Nov. 17, 2007, ECF No. 75-1. The District Court found that Sanford had presented sufficient evidence for a jury to infer that his dire situation was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899-900 (6th Cir. 2004). It thus denied the motion, holding that genuine disputes of material fact exist as to whether the Nurses ignored Sanford's deteriorating condition and need for a physician's diagnosis and treatment.[1]

On appeal, the Nurses dispute the District Court's finding that a reasonable jury could conclude that they did not timely inform a treating physician of Sanford's deteriorating condition. The Nurses contend we have jurisdiction over their appeal because the District Court made "blatantly and demonstrably false factual determinations" in finding a factual dispute. We agree with the District Court, and therefore **DISMISS** this appeal for lack of jurisdiction.

## I.  Factual and Procedural History

On Sunday December 2nd, 2007, Youth Facility staff took Sanford to the emergency room of a local hospital. He was feverish, dehydrated, unable to walk, and "smell[ed] of fecal material." He was admitted and subsequently diagnosed with a fractured pelvis and an infected

---

[1] Sanford brought claims against Nurses Stewart, Welfle, Richards, Moore, Flood, and James. The District Court granted summary judgment and qualified immunity only to Nurse James, who is not a party to this appeal.

"left hip abscess" which had formed around the fracture site and had advanced into life-threatening sepsis. By the time Sanford was taken to the emergency room, the Nurses had been documenting his unresolved hip pain over the course of 72 days.

### A. *Medical Complaint Procedures at the Youth Facility*

Normally, nurses at the Youth Facility initially address medical complaints before a patient is seen by the doctor. Patients may seek medical care by notifying dormitory staff, going to the infirmary, or completing a "Health Service Request" form. Nurses document all medical complaints and courses of treatment in written "Progress Notes" and make them a part of the patient's medical records.

Dr. Barbara Volk was the Youth Facility's physician during the relevant time period. Her duties included reviewing and updating "Standing Orders," which are written instructions regarding how nurses are to handle certain medical complaints. The Standing Orders permit nurses to issue medication and are designed to treat relatively minor ailments, thereby avoiding the need to call Dr. Volk every time a patient has a medical complaint. Because she was an independent contractor, Dr. Volk only visited the Youth Facility on Wednesday mornings to examine any sick or injured patients whom the nurses had added to the "Health Call List." When not physically present, Dr. Volk was on call at all times.

Although some medications could be dispensed without notifying a physician, the Standing Orders mandated that certain medical emergencies be reported to Dr. Volk. These included reports of chest pain, as well as "[a]ny injury that has limitation of motion and/or point tenderness to a significant degree." In her deposition, Dr. Volk testified that "limitation of motion" includes limping. Such injuries were to be treated as possible fractures and considered emergencies if they implicated a "joint space." Additionally, if a patient refused a nurse's

examination, the Department of Youth Services' Standard Operating Procedures required that nurses notify their supervisor or the doctor.

### B.     Timeline of Sanford's Medical Complaints

#### 1.     September 20th (Nurse Stewart)

Sanford injured his hip while playing football at the Youth Facility. Nurse Stewart treated him for left hip pain and administered ibuprofen. Although Nurse Stewart's notes indicate that Sanford stopped limping when told he would not be able to participate in a horseback riding program, she later stated that she believed his pain was real. Nurse Stewart did not inform a physician of Sanford's injury or refer him for further evaluation.

#### 2.     October 10th-12th (Nurse Moore)

Sanford again complained of leg pain on October 10th. An unidentified nurse documented that he had "upper leg pain" and administered ibuprofen. He submitted a second "Health Services Request" on October 11th regarding the same "upper left leg pain." Nurse Moore saw him on October 12th and administered more ibuprofen. Although this was Sanford's third complaint of left hip and upper left leg pain, Nurse Moore wrote "no history of injury" in her assessment. Nurse Moore did not notify a physician or superior of Sanford's condition, nor did she refer him for further evaluation.

#### 3.     November 27th & 28th (Nurses Welfle & Stewart)

Sanford submitted a third "Health Services Request" on November 27th, again complaining of pain in his left leg. In the early morning of November 28th, dormitory staff reported in the Unit Log Entry[2] that Sanford was complaining of hip pain.

---

[2] "Unit Log Entry" refers to notes taken by the dormitory staff at the Youth Facility.

Nurse Welfle examined Sanford at 8:55 a.m. on Wednesday, November 28th. She evaluated his condition as "leg stiff from playing ball, [no acute distress]," gave him Tylenol for his pain, and ordered him to "do stretching before sports." She did not inform a physician or superior — despite Dr. Volk's presence at the Youth Facility that morning. Later that day, Sanford requested an x-ray be taken of his left hip and Nurse Welfle ordered him one. Despite this x-ray order, Nurse Welfle did not place Sanford on any activity restrictions, and security video shows him at gym class shortly thereafter. In contrast to Welfle's assertion that Sanford had complete range of movement, the gym video shows him limping and unable to move with a normal gait.

While playing basketball during gym class, another youth allegedly struck Sanford's left hip. Security video shows that two other students half-carried Sanford to the medical clinic, where Nurses Stewart and James treated him for "severe [left] hip pain." Nurse James called the mobile x-ray unit, administered ibuprofen, and documented that Sanford "ambulated with a limp out of medical." The Nurses did not notify Dr. Volk.

### 4. November 29th (Nurses Moore, Richards, Stewart, & Welfle)

At 7:30 a.m., dormitory staff informed Nurse Moore that Sanford "refused to come to medical due to [a] 'sore hip.'" Nurse Richards administered ibuprofen "for severe [left hip pain]." The 7:45 a.m. Unit Log Entry states that Sanford was to remain in the dormitory for the first half of the school day, noting that he had been "taken to medical due to severe pain in his leg. Nurse also stated [he] has a high fever." A 10:45 a.m. entry by Nurse Richards states "pain not quite as bad – [left] hip" and that she gave Sanford additional ibuprofen "for [left] hip pain – ambulating with limp." The Nurses did not notify Dr. Volk.

At 2:05 p.m., Sanford saw Nurse Welfle due to a "complaint of leg [pain]." Despite the fact that Sanford was in his dorm all morning and other nursing staff had seen him limping and documented his pain as "severe," Nurse Welfle wrote that he "[h]as been walking normal all day. Was sent to [In School Suspension] – Now stating leg hurts." Her entry makes no reference to providing medicine or conducting an assessment.

The x-ray results came back negative for fractures at approximately 4:23 p.m.[3] According to Dr. Volk, nurses were supposed to inform her if an x-ray came back negative but a patient continued having pain. Despite this order, Dr. Volk later stated that she does not remember getting a call that Sanford was having continued pain, nor was she even informed that an x-ray had been ordered.

At 5:20 p.m., Nurse Stewart documented that Sanford's symptoms were not improving. Her notes indicate "left pelvic discomfort" that was "[t]ender to touch," that Sanford was "limping," and that he had a fever. According to expert testimony, undiagnosed joint area pain accompanied by a fever is a "medical emergency." Despite being "concerned" about the fever and hip pain, Nurse Stewart did not call Dr. Volk. Instead, she merely scheduled Sanford for Dr. Volk's next health call — which was not for six more days.

### 5. November 30th (Nurse Welfle)

At 7:45 a.m., Nurse Welfle wrote that Sanford was again complaining of hip pain. There is no indication that she took his vitals. Instead, she issued a Standing Order for ibuprofen and instructed Sanford to "[i]ncrease fluids and try to walk around."

---

[3] Later investigation determined that the x-ray did not image the full pelvis and thus did not capture the fracture of Sanford's iliac crest.

Although Sanford continued to have unresolved pain with increased fever, it does not appear that anyone saw him again on Friday, November 30th. The Unit Log Entry that morning reports that Sanford stayed in his dorm and did not go to school.

### 6. December 1st (Nurse Moore & Flood)

Sanford again complained about his leg at 7:00 a.m. and was sent to the Youth Facility clinic at 8:20 a.m. At 8:30 a.m., Nurse Moore documented that Sanford "refused earlier to come for medication, now in medical complaining of left hip pain." She also noted that he "refus[ed] to allow nurse to do assessment. Told him to apply hot moist washcloth to hip and come at 11am for ordered meds."

At 9:05 p.m., Nurse Flood wrote: "Meds to dorm. [Sanford] lying in bed refuses to get up [complaining of] chest pain youth finally raised torso up slightly and took meds when asked how long he had chest pain he laid back down and covered his head with his blanket. Nurse Flood did not notify Dr. Volk of Sanford's refusal of her examination, nor is there any documentation that Flood took Sanford's vitals. Additionally, it appears that Nurse Flood failed to comply with Dr. Volk's Standing Orders requiring her notification upon a complaint of chest pain.

### 7. December 2nd (Nurses Moore & Flood)

Dormitory staff called the nurses at 12:20 p.m. to come and see Sanford due to hip pain. Nurses Flood and Moore brought him to medical in a wheelchair, where he "required assistance in transport from chair to exam table." He was running a fever, dehydrated, demonstrated "extreme tenderness" in his left hip area and "smell[ed] of fecal material." Sanford was subsequently taken to the hospital and diagnosed with a fractured hip (iliac crest), sepsis, and diffused pneumonia. He remained hospitalized for twenty days and required surgery and a blood

transfusion. He was in the intensive care unit, on a ventilator, and in respiratory isolation. He had septic emboli to the lungs with pneumonia, was on intravenous antibiotics, and was in four point medical restraints so he would not pull out his endotracheal tube. In short, Sanford was critically ill.

### C.        *Procedural History*

Upon notification of Sanford's ordeal, the Chief Inspector's Office of the Ohio Department of Youth Services conducted an internal investigation. *See* Report of Investigation, Nov. 17, 2007, ECF No. 75-1. Their report concluded that "medical personnel failed to provide adequate medical care." *Id.* at 13. This lawsuit followed.

After proceeding with discovery, the District Court denied the Nurses' motion for summary judgment, finding that Sanford had produced evidence establishing a genuine issue of material fact as to whether they were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. In reviewing the record, the court determined that Sanford had provided "sufficient evidence from which a jury may infer that, prior to his admittance into the hospital on December 2nd, 2007, his injury and illness was 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" (quoting *Blackmore*, 390 F.3d at 899-900). The District Court further found that Sanford had "presented sufficient evidence in the form of medical proof" from which a jury could find that "the delay [in treatment] caused a serious medical injury." (citing *Blackmore*, 390 F.3d at 899). Finally, the District Court determined that there was sufficient evidence for a jury to find that, due to his dangerously deteriorating condition after aggravating his injury on November 28th, Sanford faced a substantial risk of serious harm, and that a reasonable jury could find that Nurses Stewart, Welfle, Richards, Moore, and Flood perceived and disregarded that substantial risk.

Most importantly, the District Court found that "the record does not confirm that Dr. Volk had been notified," that there was "a genuine issue of fact regarding whether the nurses notified the attending physician," and that the Nurses were aware that Sanford's condition had been deteriorating yet provided care a jury could find so cursory or inadequate as to constitute no treatment at all.

## II. Jurisdiction Over Denial of Qualified Immunity

We review a district court's denial of summary judgment based on qualified immunity grounds *de novo*. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013) (citation omitted). Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Courts must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The ultimate question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

It is well settled that our interlocutory jurisdiction over orders denying qualified immunity is quite narrow. *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008). A district court's denial of qualified immunity is an appealable final decision under 28 U.S.C. § 1291 only "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Indeed, interlocutory appeals from denials of qualified immunity must be "limited to cases presenting neat abstract issues of law" and such defendants "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 317, 319-20 (1995) (quoting

15A C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3914.10, at 664 (1992)).

In their attempt to justify an improper interlocutory appeal, the Nurses accuse the District Court of "blatantly and demonstrably false factual determinations." *See* Nurses' Br. at 23. They thus invoke the language of the "one limited exception" by which we might consider their version of the facts on an interlocutory appeal. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that on summary judgment, a court should not adopt a version of the facts "blatantly contradicted by the record"). This exception, however, is met only "where the evidence is so utterly discredited by the record as to be rendered a visible fiction." *Younes v. Pellerito*, 739 F.3d 885, 889 (6th Cir. 2014) (quoting *Scott*, 550 U.S. at 380-81).

Typically, "if what is at issue in the appeal is nothing more than 'whether the evidence could support a finding that particular conduct occurred,' there is no appellate jurisdiction because that question is inseparable from the merits of the plaintiff's claim." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)). In this case, we lack jurisdiction because this appeal presents precisely the same situation. A key component of Sanford's case involves his allegation that the Nurses failed to inform Dr. Volk of his deteriorating condition. *See* Mem. Op. at 19 ("[Sanford] alleges he became septic precisely because his condition was not discovered sooner, due to the delay in medical treatment."). The Nurses, however, argue that Sanford's medical records serve as "objective evidence" that Dr. Volk was in fact notified of his condition by telephone on November 30th, 2007. The Nurses thus contend that the District Court's finding of a genuine issue of material fact regarding whether Dr. Volk was notified of Sanford's leg pain is a "blatantly false determination in light of the objective medical evidence." *See* Nurses' Reply Br.

at 10. Because the record does not discredit Sanford's evidence as the Nurses claim, we conclude that the District Court was correct in denying qualified immunity.

In its denial of summary judgment, the District Court also found that the medical orders do not make clear whether Dr. Volk was consulted or gave medical orders on November 30th, 2007. This finding is amply supported by the record, which contains numerous inconsistencies regarding whether Dr. Volk actually received notice of Sanford's condition. For example, Dr. Volk herself stated during the Youth Services internal investigation that no one contacted her about Sanford's condition until the afternoon of December 2nd. She later testified in depositions that she did not recall whether the Nurses contacted her prior to Sanford's admittance to the hospital.

Despite these inconsistencies, the Nurses insist that a "telephone order" given by Dr. Volk on November 30th confirms that she received notification of Sanford's complaints of leg pain on that day. The District Court found that this document proves very little because it was not signed by Dr. Volk until December 5th — one week after Sanford's admission to the hospital. Although the Nurses acknowledge this date discrepancy, they maintain that it is inconsequential because "the District Court failed to consider evidence that Dr. Volk would not have had the opportunity to sign the telephone order until the following week when [she] made her weekly visit to the [Youth Facility]." *See* Nurses' Reply Br. at 14. Again, this is not so. In fact, the District Court specifically highlighted this evidence. *See* Mem. Op. at 11 ("To add to the uncertainty [about the date discrepancy], Nurse Welfle testified that Dr. Volk would review and sign the charts and orders from the previous week when she visited the [Youth Facility]."). Moreover, Dr. Volk stated that although she had not ordered Sanford's x-ray, one of the Nurses must have listed her name as the ordering physician without first discussing the order with her.

It is certainly possible that a similar action could have occurred regarding the November 30th order. Thus, the November 30th order does not clearly show that it was issued by Dr. Volk. A factual issue therefore exists as to whether Dr. Volk was notified of Sanford's condition.

Finally, the Nurses point to deposition testimony of Sanford's own expert as "objective evidence" that they did in fact notify Dr. Volk. *See* Nurses' Reply Br. at 10. The nature of the questioning at this deposition, however, was purely speculative. Moreover, this expert was merely opining on the medical records; she was not present at the Youth Facility and has no basis for knowing whether anyone ever actually contacted Dr. Volk.

### III.    Conclusion

This frivolous appeal does not present a question of law, but rather an argument over which version of the facts is most credible, as the District Court concluded. We have no jurisdiction over these so-called "legal" arguments because they "rely entirely on [the Nurses'] own disputed version of the facts," presenting us with "issues of fact and credibility determinations" which the jury will have to make. *Thompson v. Grida*, 656 F.3d 365, 367 (6th Cir. 2011). This case does not fall within the narrow category of cases open to interlocutory appeal based on qualified immunity. Accordingly, we **DISMISS** for lack of appellate jurisdiction and return the case to the District Court for further proceedings consistent with this opinion.